### UNITED STATES v. ACZEL et al.

(District Court, D. Indiana. February 1, 1915.)

No. 212.

1. CONSPIRACY ⊜⇒32—PRIVILEGES OF CITIZENS—RIGHT TO VOTE.

Under Const. art. 1, § 2, providing that the House of Representatives shall be composed of members chosen by the people of the several states, and the electors in each state shall have the qualifications of the electors of the most numerous branch of the state Legislature, and Const. Amend. 17, making similar provisions for United States Senators, and Act June 4, 1914, c. 103, 38 Stat. 384, providing for the election of United States Senators by direct vote of the people, the election to be conducted as near as may be in accordance with the laws of the state regulating the nomination and election of Representatives, the right to vote for Representatives in Congress and United States Senators, and to serve as members of the election boards where such Representative or Senator is to be elected, are rights secured by the Constitution and laws of the United States, within Cr. Code (Act March 4, 1909, c. 321) § 19, 35 Stat. 1092 (Comp. St. 1913, § 10183), making punishable a conspiracy to deprive any citizen of any right or privilege secured to him by the Constitution and laws of the United States.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. §§ 58, 59; Dec. Dig. ⊜⇒32.]

---

2. INDICTMENT AND INFORMATION ⬤➞125—CONSPIRACY—DUPLICITY.

An indictment for conspiracy, which charges a single combination or conspiracy to commit several different crimes, is not duplicitous.

[Ed. Note.—For other cases, see Indictment and Information, Cent. Dig. §§ 334–400; Dec. Dig. ⬤➞125.]

3. CONSPIRACY ⬤➞33—DEFRAUDING GOVERNMENT—CORRUPTING ELECTION.

A conspiracy to corrupt voters at an election for Representatives in Congress and United States Senators and to corrupt the election itself is within the prohibition of Cr. Code, § 37 (Comp. St. 1913, § 10201), making it an offense to conspire to defraud the United States in any manner and for any purpose, since an actual property or financial loss to the government is not necessary to that offense.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 60; Dec. Dig. ⬤➞33.]

4. CONSPIRACY ⬤➞33—DEFRAUDING GOVERNMENT—CORRUPTING ELECTION— PROPERTY LOSS.

If a property loss is essential to the offense prohibited by Cr. Code, § 37, of conspiracy to defraud the United States, such loss is shown by an allegation in the indictment that one of the objects of the conspiracy was to secure for a person not duly elected to Congress the compensation payable to a congressman.

[Ed. Note.—For other cases, see Conspiracy, Cent. Dig. § 60; Dec. Dig. ⬤➞33.]

5. POST OFFICE ⬤➞35—OFFENSES—USE OF MAILS TO DEFRAUD.

A scheme to corrupt a state election and the voters thereat, so as to secure the election of a certain judge, who was not the real choice of the voters, and thereby to enable one who was not entitled thereto to draw the salary of that office, is a scheme to defraud, within Cr. Code, § 215 (Comp. St. 1913, § 10385), prohibiting the use of the United States mails for the purpose of executing a scheme or artifice to defraud.

[Ed. Note.—For other cases, see Post Office, Cent. Dig. § 55; Dec. Dig. ⬤➞35.]

Alexander Aczel and others were indicted for conspiracy and for using the mails to carry out a scheme to defraud. Demurrers to the indictment overruled.

Frank C. Dailey, U. S. Dist. Atty., of Bluffton, Ind., and Milton W. Mangus, Asst. U. S. Atty., of Indianapolis, Ind.

A. O. Stanley, of Henderson, Ky., and Finley P. Mount, Clarence W. Nichols, and F. S. Roby, all of Indianapolis, Ind., for defendants.

ANDERSON, District Judge. The indictment in this cause is in four counts. The first count is based on section 19 of the Criminal Code, which reads as follows:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same, or if two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured, they shall be fined not more than five thousand dollars and imprisoned not more than ten years, and shall, moreover, be thereafter ineligible to any office, or place of honor, profit, or trust created by the Constitution or laws of the United States."

This first count in substance charges that the defendants, on the 1st day of September, 1914, in Vigo county, within the state and district

of Indiana, did unlawfully, knowingly, willfully, wrongfully, and feloniously conspire, combine, confederate, and agree together, and with divers other persons whose names are to the grand jurors unknown, to injure, oppress, threaten, and intimidate certain citizens of the United States, naming them, and each of them, and divers other persons whose names are to the grand jurors unknown, in the free exercise and enjoyment of a right and privilege secured to them, and each of them, by the Constitution and laws of the United States of America, to wit: The right and privilege of voting at a general election, hereinafter named, for a candidate for United States Senator from the state of Indiana, and for a candidate for Representative in the Congress of the United States of America from the Fifth congressional district of the state of Indiana, with the unlawful intent to hinder the free exercise and enjoyment of the right and privilege of them, and each of them, of voting at said general election, hereinafter named, for a candidate for United States Senator from the state of Indiana, and for a candidate for Representative in the Congress of the United States from the Fifth congressional district of the state of Indiana, which said general election was to be, and in fact was, held in the state of Indiana and in said Fifth congressional district thereof, of which said county of Vigo forms a part, on the 3d day of November, in the year of our Lord 1914, at which time a United States Senator from the state of Indiana was to be, and in fact was, voted for, chosen, and elected, and at which time a Representative in Congress of the United States of America was to be, and in fact was, voted for, chosen, and elected from the Fifth congressional district of the state of Indiana, by then and there, by force, threats, and intimidation, and by the use of pistols and other firearms, and by the means of the fraudulent manipulation of voting machines, and by causing others to vote upon their names and in their stead, attempting to prevent, preventing, and intending to prevent said persons, naming them, and divers other persons whose names are to the grand jurors unknown, from voting at said election and from voting for a candidate for United States Senator from the state of Indiana, and from voting for a Representative in Congress from the Fifth congressional district of the state of Indiana. That said persons who were prevented from voting at said election were at said time male citizens of the United States and legal voters of certain precincts and wards in Vigo county, Ind., at said election, and were qualified voters and entitled to vote at said election, which facts were then and there to the defendants well known, and that in pursuance of said conspiracy and to effect the purpose and object thereof the defendants unlawfully, willfully, corruptly, and maliciously injured, and in the manner and ways aforesaid prevented the said voters from voting on said day and from voting at said election.

That the said defendants, at the same time and place, and as a part of the same conspiracy, combination, confederation, and agreement, did unlawfully, knowingly, wrongfully, and feloniously conspire, combine, confederate, and agree together, and with divers other persons whose names are to the grand jurors unknown, to injure, oppress, threaten,

and intimidate certain citizens of the United States, to wit, Harvey Day and Sherman T. Mann, and each of them, and divers other persons whose names are to the grand jurors unknown, in the free exercise and enjoyment of a right and privilege secured to them, and each of them, by the Constitution and laws of the United States, to wit: The right and privilege of sitting and acting and serving as members of election boards at said election; that is to say, as judges of election at said election, by then and there, by force, threats, and intimidation, attempting to prevent, preventing, and intending to prevent them, the said Day and Mann, and each of them, and divers other persons whose names are to the grand jurors unknown, from sitting and acting and serving as members of election boards of said election, to wit, as judges of election. That the persons so prevented from acting as judges of election were male citizens of the United States and qualified electors in the respective precincts in which they resided, and were qualified under the law to be selected, and were, under the law, selected as judges of election in their respective precincts. That said right and privilege to sit and act and serve as judges of election were secured to them by the laws of the state of Indiana and by the laws of the United States of America. That in pursuance of such conspiracy, and to effect the purpose and object thereof, the defendants unlawfully, willfully, corruptly, and maliciously injured and prevented the said Day and Mann, and each of them, and divers other persons whose names are to the grand jurors unknown, from sitting and acting and serving as members of election boards at said election, to wit, as judges of election. That the defendants, as a part of the same conspiracy, combination, confederation, and agreement, planned to prevent and hinder, and by the same means and methods did prevent and hinder, William House and George Splaty, and divers other persons, from sitting and acting and serving as poll clerks at said election, with proper averments that at the time said House and Splaty were male citizens of the United States and were qualified electors, and duly qualified to act as poll clerks at said election. That as a part of the same conspiracy, combination, confederation, and agreement, the defendants planned to hinder and prevent, and did by the same means and methods theretofore set out in the case of judges and poll clerks prevent, Howard P. Greiner and divers other persons whose names are to the grand jurors unknown from acting and serving as an inspector of election at said election, and said Greiner is alleged to have been a citizen of the United States and under the laws of the state of Indiana duly qualified to act as inspector of said election.

That at the same time and place, and as a part of the same conspiracy, combination, confederation, and agreement, the defendants did unlawfully, knowingly, willfully, wrongfully, and feloniously conspire, combine, confederate, and agree together, and with divers other persons whose names are to the grand jurors unknown, to injure, oppress, threaten, and intimidate certain citizens of the United States, naming them, and divers other persons whose names are to the grand jurors unknown, in the free exercise and enjoyment of a right and privilege secured to them, and each of them, by the Constitution and laws of the United States, to wit: The right and privilege of liberty

and freedom from arrest, without due process of law, and the right and privilege not to be placed in, or confined in, detention cells and jails, without due process of law, with the unlawful intent then and there to hinder the free exercise and enjoyment of the right and privilege of them, and each of them, of liberty and freedom from arrest, without due process of law, and the right and privilege not to be placed in, or confined in, detention cells and jails, without due process of law, by then and there, by force, depriving them of their liberty, without due process of law, and by arresting them, without due process of law, for no offense, and with knowledge on the part of the defendants, and each of them, that they had committed no offense, and restraining them of their liberty, without due process of law, and by confining them, without due process of law, in the detention cell of the said city of Terre Haute and in the jail of said county of Vigo. That the defendants Roberts, Holler, Nugent, Joseph Jeffers, Lloyd, and Shea were, during all of said time, agents of the state of Indiana, and in the said conspiracy, combination, confederation, and agreement against said persons, and in all their acts and conduct in relation thereto pretended to and did act by authority of their said offices and their said agency for the state of Indiana, which facts were then and there and at all times well known to all of the defendants herein. The indictment then avers that Roberts was mayor of the city of Terre Haute, that Holler was chief of police of said city, that Nugent was assistant chief of police of said city, that said Joseph Jeffers and Lloyd were policemen in and for said city, and that said Shea was county sheriff of the county of Vigo and in charge of the county jail thereof; that in pursuance of said conspircy and to effect the purpose and object thereof, the defendants unlawfully, willfully, corruptly, and maliciously injured said persons, and divers other persons whose names are to the grand jurors unknown, and arrested them and placed them in the detention cell of the said city of Terre Haute, and in the jail of said Vigo county, without due process of law.

That all of said matters above set forth, upon which the defendants conspired, confederated, and agreed together as aforesaid, including said agreement to prevent said voters from voting, including the said agreement to prevent said men from sitting, acting, and serving upon election boards, including the said agreement to prevent said men from sitting, acting, and serving as poll clerks at said election, and including said agreement to deprive said men of their liberty and to confine them in detention cells and jails, without due process of law, all as aforesaid, constituted one agreement, and were all parts of one conspiracy, combination, confederation, and agreement, entered into at one and the same time and place.

The second count is based on section 37 of the Criminal Code, which reads as follows:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, each of the parties to such conspiracy shall be fined not more than ten thousand dollars, or imprisoned not more than two years, or both."

This second count in substance charges that the defendants, on the 1st day of September, 1914, in Vigo county, within the state and district of Indiana, did unlawfully, knowingly, willfully, wrongfully, and feloniously conspire, combine, confederate, and agree together, and with divers other persons whose names are to the grand jurors unknown, to defraud the United States of America, by committing a willful fraud upon the law of the United States, that is, article 1, § 2, of the Constitution of the United States, providing for the election of members of the House of Representatives of the Congress of the United States, and an act of the Congress providing a method of conducting the nomination and election of United States Senators, approved June 4, 1914, and by committing a willful fraud upon the Constitution and laws of the United States of America, which provide that an elector shall vote one time only for a candidate for United States Senator at a given election, and one time only for a candidate for member of the House of Representatives at a given election, and further by perverting and obstructing the due administration of said laws, and cause and bring about the maladministration thereof, and by corruptly administering and procuring the administration of said laws, and each of said laws, and by obtaining from the Governor of the state of Indiana a certificate of election certifying that a person whom they intended to elect illegally and contrary to the laws of the state of Indiana and the Constitution and laws of the United States of America was regularly elected Representative in Congress from said district at said election, and by foisting upon the United States and upon the House of Representatives thereof, as a duly elected member of the House of Representatives of the United States of America, a person whom they intended to elect illegally and contrary to the laws of the state of Indiana and the Constitution and laws of the United States of America, as a member of the House of Representatives of the United States of America, and to secure for such person, not duly elected or chosen, the privileges, immunities, and emoluments as a member of said House of Representatives, including the annual salary of $7,500 provided as compensation for a duly elected member of said House of Representatives. That the defendants did unlawfully, knowingly, willfully, wrongfully, and feloniously conspire, combine, confederate, and agree together to violate the provisions of said laws and each of said laws, and pervert and obstruct the due administration of said laws, and each of said laws, and cause and bring about the maladministration thereof, and corruptly administer and procure the administration of said laws, and each of said laws, and commit a willful fraud upon said laws, and each of said laws, at the general election to be held, and which was thereafter held, on Tuesday, November 3, 1914, at which time a United States Senator for the state of Indiana was to be, and in fact was, voted for, chosen, and elected, and at which time a Representative in Congress of the United States of America was to be, and in fact was, voted for, chosen, and elected, in the Fifth congressional district of the state of Indiana, of which the said county of Vigo forms, and during all of said time formed, a part. That the defendants, for said purpose and with said intention, agreed to-

gether to vote and cause to be voted, for candidate for United States Senator, and also for candidate for Representative in Congress at said election, in the various election precincts of said Vigo county, a large number of persons who did not and would not have or possess the qualifications requisite for electors at said election, and were not legal voters at said election, some of them because they had not yet attained the age of 21 years, some because they had not lived and resided in the state or township or precinct the time required by the Constitution and laws of the state of Indiana, and some of whom were not registered voters under the law of the state of Indiana, and for said purpose and with said intention did agree together to vote at said election, and cause to be voted, each more than one time, a large number of voters on the names of other registered voters, and upon the names, both real and fictitious, registered at the regular registration period provided by the laws of the state of Indiana.

This count then sets out a series of acts, which are averred to be overt acts, done in pursuance of, in furtherance of, in execution of, and for the purpose of carrying out and to effect the object, design, and purpose of the said conspiracy, combination, confederation, and agreement aforesaid. This second count is based upon that part of section 37 which makes it a crime for two or more persons to conspire together to defraud the United States in any manner or for any purpose.

The third count is based upon that part of section 37 which makes it a crime for two or more persons to conspire to commit an offense against the United States. In substance this count charges that the defendants, in Vigo county, state of Indiana, and the district aforesaid, on the 1st day of September, 1914, did unlawfully, knowingly, willfully, wrongfully, and feloniously conspire, combine, confederate, and agree together, and with divers other persons whose names are to the grand jurors unknown, to commit an offense against the United States, defined and made punishable by the laws of the United States, to wit: To knowingly, willfully, fraudulently, unlawfully, and feloniously devise a certain scheme and artifice to defraud, and for obtaining money by false and fraudulent pretenses, from James Shea, Albert Shea, Wade Duncan, Walter Roach, James Dolan, Philip Burns, and divers other persons whose names are to the grand jurors unknown, and to defraud one Charles Pulliam, and to defraud and for obtaining money by false and fraudulent pretenses from the state of Indiana, which said scheme and artifice to defraud, and for obtaining money by false and fraudulent pretenses was as follows: That the said defendants would represent to the said James Shea and others, each and all of whom at said time and continuously thereafter conducted various saloons and gaming houses in the city of Terre Haute, in the said county of Vigo, state of Indiana, that the said James Shea and others, by the donation of large sums of money to the campaign fund, which the said defendants were to collect, would be given immunity from prosecution and arrest for all violations of the law that they should commit, and would be permitted to conduct gaming devices and gaming houses without hindrance or interference, and would be permitted to keep open their saloons and sell intoxicat-

ing liquors at hours when prohibited by law, and to sell intoxicating liquors to persons to whom the law forbade them to sell, and to conduct dance halls, wine rooms, music, and restaurants in connection with their saloons, in contravention of law, and would keep Terre Haute a wide-open town, and which said scheme and artifice was further as follows: That they would use the money so collected to debauch the electorate of the said county of Vigo at a general election to be held (and which was held) in the state of Indiana generally, and in the said county of Vigo, on Tuesday, November 3, 1914, at which election one Charles Pulliam was a candidate for judge of the Vigo circuit court, and the said Eli Redman was an opposing candidate for the same office. That they would use said money to cheat and defraud the said Charles Pulliam out of said office, and prevent the majority of votes from being rightfully counted in his favor, and wrongfully count and cause to be counted the majority of votes in favor of the said Eli Redman, and wrongfully place the said Eli Redman in said office. That they would employ floaters and repeaters from other counties in said state, and from other states, to falsely register as voters in said county of Vigo at said election. That they would hire many men, each to register many times under assumed names in one precinct, and to register each in various precincts in said county for said election. That they would buy and hire many men, each to vote many times in one precinct, and many men to vote at various precincts in said county at said election, and to hire boys under the age of 21 years and foreign-born citizens who had no right to vote at said election, and many men who had no residence in said Vigo county, and many men who had not registered to vote in said county, to vote at said election. That they would hire and buy all of said men to vote against the said Charles Pulliam and in favor of the said Eli Redman, and purchase members of election boards to commit frauds of all kinds in favor of the said Eli Redman and against the said Charles Pulliam, and would thereby prevent the election of the said Charles Pulliam to said office and fraudulently obtain the same for the said Eli Redman, and would fraudulently foist the said Eli Redman upon the state of Indiana as the duly elected judge of the Vigo circuit court, and that they would thereby cheat and defraud the state of Indiana out of a large sum of money, by obtaining from it, for the said Eli Redman, the annual salary of $4,000 provided by law as compensation for the duly elected and chosen judge of the said Vigo circuit court, and that they would, for the purpose of executing said scheme and artifice, place and cause to be placed a large number of letters in the United States post office at the said city of Terre Haute, Ind., addressed to various persons, to be sent and delivered by the post office establishment of the United States to the respective addresses of said letters.

This count then sets out a number of acts which are averred to have been done in pursuance of, in furtherance of, in execution of, and for the purpose of carrying out and to effect the object, design, and purpose of said conspiracy. The offense which the defendants are charged in this count with having conspired to commit is the use

of the mails in a scheme to defraud, denounced by section 215 of the Criminal Code.

The fourth count is based on section 215 of the Criminal Code which, so far as applicable to this cause, reads as follows:

"Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, * * * shall for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter, postal card, package, writing, circular, pamphlet, or advertisement, * * * in any post office, or station thereof, * * * shall be fined not more than one thousand dollars or imprisoned not more than five years, or both."

This count in substance avers that the defendants, and divers other persons whose names are to the grand jurors unknown, on the 30th day of September, 1914, did then and there knowingly, willfully, fraudulently, unlawfully, and feloniously devise a certain scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, from the state of Indiana, James Shea, Albert Shea, Wade Duncan, Walter Roach, James Dolan, Philip Burns, Charles Pulliam, and divers other persons whose names are to the grand jurors unknown, which said scheme and artifice to defraud, and for obtaining money as aforesaid, was then and there as follows: Said defendants had then and there unlawfully, knowingly, willfully, and feloniously conspired, combined, confederated, and agreed together, and with certain divers other persons whose names are unknown to the grand jurors aforesaid, to enter into a certain scheme and artifice to defraud, and for obtaining money, to wit: They, and each of them, would fraudulently represent to the said James Shea, Albert Shea, Wade Duncan, Walter Roach, James Dolan, Philip Burns, and divers other persons whose names are to the grand jurors unknown, that if they would pay to said defendants large sums of money for the purpose of use in the hereinafter described election, that the said James Shea, Albert Shea, Wade Duncan, Walter Roach, James Dolan, Philip Burns, and divers other persons whose names are unknown to the grand jurors, should have the exclusive gambling privilege in the city of Terre Haute, Ind., and should have the exclusive right and privilege of keeping their respective saloons open after legal hours, free from arrest for all violations of law that the said James Shea, Albert Shea, Wade Duncan, Walter Roach, James Dolan, Philip Burns, and divers other persons whose names are unknown to the grand jurors aforesaid, might commit. Said scheme and artifice to defraud, and for obtaining money as aforesaid, and said conspiracy, combination, confederation, and agreement aforesaid, was then and there further to register at the October registration for the general election of November 3, 1914, in Vigo county, Ind., a large number of names of persons who did not reside in the divers precincts where registered in said Vigo county at the time of such registration, and of persons who at the time of said election of November 3, 1914, would not have resided in the respective precincts in said county where registered 30 days immediately and continuously preceding said election. Said scheme and artifice to defraud, and for obtaining money as

aforesaid, and said conspiracy, combination, confederation, and agreement aforesaid, was then and there further to vote at said general election in Vigo county, Ind., November 3, 1914, a large number of persons who would vote in one precinct, then go to another precinct and vote, and then go to as many precincts as said person could, when in fact said person would have the right to vote in only one precinct in said county at said election. Said conspiracy, combination, confederation, agreement, and scheme and artifice to defraud, and for obtaining money as aforesaid, was then and there further to vote persons who were not legally entitled to vote in the precincts where they would vote, and persons whose votes would be purchased. Said conspiracy, combination, confederation, agreement, and scheme and artifice to defraud, and for obtaining money as aforesaid, was then and there further to obtain control of the election boards in divers precincts of said Vigo county, Ind., for said general election, and to instruct, induce, and persuade the election inspectors in said precinct voting places to operate the lever on the voting machines in said precinct voting places, and not permit the voter to operate said lever. Said lever was further to be operated by the said inspectors in such a manner that, should a voter enter any polling place in said Vigo county in said general election who was in opposition to the aforesaid conspiracy, combination, confederation, agreement, and scheme and artifice to defraud, and for obtaining money as aforesaid, said inspectors would then and there forcibly operate said machine, so that the vote of such voter should be registered on said machine in accordance with the aforesaid conspiracy, combination, confederation, agreement, and scheme and artifice to defraud, and for obtaining money as aforesaid, and contrary to the will of such voter.

That said Eli Redman was then and there candidate for election as judge of the Vigo circuit court of Vigo county, Ind., in opposition to the said Charles Pulliam; that a part of the salary of the said circuit judge is payable out of the treasury of the state of Indiana and out of the moneys of the state of Indiana; that said conspiracy, combination, confederation and agreement and scheme and artifice to defraud, and for obtaining money as aforesaid, was then and there and by the aforesaid means to foist upon the state of Indiana the said Eli Redman as the duly elected judge of the Vigo circuit court, when in fact the said Eli Redman would not be the duly elected judge of said Vigo circuit court if said election were conducted honestly, fairly, and in accordance with the laws of the state of Indiana; that the said Charles Pulliam was then and there the duly nominated candidate for judge of the said Vigo circuit court on the Republican ticket. Said conspiracy, combination, confederation, agreement, and scheme and artifice to defraud, and for obtaining money as aforesaid, was then and there further, by the said means, to defeat the said Charles Pulliam, and deprive him, the said Charles Pulliam, of the emoluments of said office of judge of the said Vigo circuit court. Said state of Indiana had, prior to the formation of said conspiracy, combination, confederation, agreement, and scheme and artifice to defraud, and for obtaining money as aforesaid, duly enacted laws for the registration of voters and describing the qualifications and fitness of voters at said general

election; that said conspiracy, combination, confederation, agreement, and scheme and artifice to defraud, and for obtaining money as aforesaid, was then and there to conduct the registration of voters for such general election and to conduct and carry on said general election contrary to and in violation of the aforesaid laws of the state of Indiana, and in such a manner and by such means to defraud the state of Indiana and its laws.

The count then avers that on the 25th day of October, 1914, for the purpose of executing said scheme and artifice, and attempting so to do, the defendant Donn M. Roberts did then and there knowingly, unlawfully, willfully, and feloniously place and cause to be placed a certain letter in the United States post office at Terre Haute, in said district, addressed to Joseph Kennedy, at said Terre Haute, to be sent and delivered by the said post office establishment of the United States to the said Joseph Kennedy, which said letter was then and there an invitation and call to the said Joseph Kennedy to come to the headquarters of the Democratic central committee of Vigo county, of which the said Donn M. Roberts was then and there the chairman, for the purpose of receiving instructions as to the duties of the said Joseph Kennedy, who was then and there to act as election inspector at said general election, in precinct C of the Fifth ward, in said Terre Haute, Vigo county, Ind., at the general election, November 3, 1914, at Terre Haute, Vigo county, Ind., which said letter is now destroyed, and for that reason is not made a part of the indictment, and a more particular description of which is unknown to the grand jurors. And it is further averred in this count that all the others of the defendants aided, abetted, counseled, commanded, induced, and procured the said Donn M. Roberts, for the purpose of executing said scheme and artifice and attempting so to do, to then and there place and cause to be placed in the United States post office at Terre Haute, in said district, the said letter, addressed to said Joseph Kennedy, as aforesaid.

After the return of this indictment, 115 of the defendants were arrested and brought into court. Upon being arraigned, 83 of them pleaded guilty, 5 pleaded not guilty, and the remainder, 27, filed demurrers to the indictment.

As already stated, the first count of the indictment is based upon section 19 of the Criminal Code. The part of this section which is relevant here is as follows:

"If two or more persons conspire to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, * * * they shall be fined," etc.

This count charges a conspiracy to injure, oppress, threaten, and intimidate certain citizens of the United States in the free exercise and enjoyment of the right to vote for a member of the House of Representatives of the Congress of the United States, and the right to vote for a United States Senator, and to injure, oppress, threaten, and intimidate certain other citizens of the United States in the free exercise and enjoyment of the right and privilege of sitting upon election boards and acting as judges, inspectors, and poll clerks at the election held

November 3, 1914. It is further charged in this count that the defendants at the same time, and as a part of the same agreement and conspiracy, conspired to deprive certain citizens of the United States of the right to be free from arrest, etc., without due process of law. In determining the sufficiency of this count, it will not be necessary to refer to this latter averment.

The theory of the government is that the right to vote for members of the lower house of the Congress of the United States and for United States Senators, and the right to sit and act as election officers at elections where such Representatives and Senators are elected, are rights and privileges secured by the Constitution and laws of the United States. The demurring defendants contend that such right to vote is not a right secured by the Constitution or laws of the United States, but that the right to vote is a right given exclusively by the state. This was the principal contention at the argument upon the sufficiency of this first count, and nothing has been said by counsel for the defendants upon argument or in briefs as to the right to sit upon election boards and act as members of boards of election. It is also objected that this count charges more than one offense and is bad for duplicity.

[1] Is the right to vote for a member of Congress or a United States Senator a right secured by the Constitution or laws of the United States? Article 1, section 2, of the Constitution of the United States provides:

"The House of Representatives shall be composed of members chosen every second year by the people of the several states, and the electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state Legislature."

The seventeenth amendment to the Constitution of the United States provides:

"The Senate of the United States shall be composed of two Senators from each state, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each state shall have the qualifications requisite for electors of the most numerous branch of the state Legislatures."

On June 4, 1914, Congress passed "An act providing a temporary method of conducting the nomination and election of United States Senators." The first section provides:

"That at the regular election held in any state next preceding the expiration of the term for which any Senator was elected to represent such state in Congress, at which election a Representative to Congress is regularly by law to be chosen, a United States Senator from said state shall be elected by the people thereof for the term commencing on the fourth day of March next thereafter."

The second section reads as follows:

"That in any state wherein a United States Senator is hereafter to be elected either at a general election or at any special election called by the executive authority thereof to fill a vacancy, until or unless otherwise specially provided by the Legislature thereof, the nomination of candidates for such office not heretofore made shall be made, the election to fill the same conducted, and the result thereof determined, as near as may be in accordance with the laws of such state regulating the nomination of candidates for and election of members at large of the national House of Representatives: Pro-

vided, that in case no provision is made in any state for the nomination or election of representatives at large, the procedure shall be in accordance with the laws of such state respecting the ordinary executive and administrative officers thereof who are elected by the vote of the people of the entire state: And provided further, that in any case the candidate for Senator receiving the highest number of votes shall be deemed elected.

This seventeenth amendment to the Constitution and the statute just quoted are too recent to have received any judicial construction or interpretation, but so far as the right to vote for a member of the House of Representatives of the Congress of the United States is concerned the Supreme Court of the United States has repeatedly decided that such right is fundamentally based upon, and given and secured by, the Constitution of the United States.

In Ex parte Yarbrough, 110 U. S. 651, 4 Sup. Ct. 152, 28 L. Ed. 274, this question was squarely decided. The defendants in that case had been convicted of a violation of section 19 (then section 5508 of the Revised Statutes). The case originated in the Supreme Court by an application for a writ of habeas corpus, upon the claim that defendants were held under a judgment which was null and void. After setting out the indictment, the court says:

"Stripped of its technical verbiage, the offense charged in this indictment is that the defendants conspired to intimidate Berry Saunders, a citizen of African descent, in the exercise of his right to vote for a member of the Congress of the United States. * * *"

It was claimed in that case that the right to vote for a member of Congress is not dependent upon the Constitution or laws of the United States, but is governed by the law of each state respectively. The court said:

"But it is not correct to say that the right to vote for a member of Congress does not depend on the Constitution of the United States. The office, if it be properly called an office, is created by that Constitution and by that alone. It also declares how it shall be filled, namely, by election."

The court then quotes article 1, section 2, of the Constitution of the United States, and proceeds:

"The states, in prescribing the qualifications of voters for the most numerous branch of their own Legislatures, do not do this with reference to the election for members of Congress. Nor can they prescribe the qualification for voters for those eo nomine. They define who are to vote for the popular branch of their own Legislature, and the Constitution of the United States says the same persons shall vote for members of Congress in that state. It adopts the qualification thus furnished as the qualification of its own electors for members of Congress. It is not true, therefore, that electors for members of Congress owe their right to vote to the state law in any sense which makes the exercise of the right to depend exclusively on the law of the state."

In Wiley v. Sinkler, 179 U. S. 58, 21 Sup. Ct. 17, 45 L. Ed. 84, the plaintiff sued an election board to recover damages for wrongfully and willfully rejecting his vote for a member of the House of Representatives of the United States, at the election held November 6, 1894. In that case the court said:

"The right to vote for members of the Congress of the United States is not derived merely from the Constitution and laws of the state in which they

219 F.—59

are chosen, but has its foundation in the Constitution of the United States. This is clearly and amply set forth in Ex parte Yarbrough, 110 U. S. 651 [4 Sup. Ct. 152, 28 L. Ed. 274], in which this court, speaking by Mr. Justice Miller, upheld a conviction in a Circuit Court of the United States under sections 5508 and 5520 of the Revised Statutes for a conspiracy to intimidate a citizen of the United States in the exercise of his right to vote for a member of Congress, and answered the proposition 'that the right to vote for a member of Congress is not dependent upon the Constitution or laws of the United States, but is governed by the law of each state respectively,' as follows:"

—and then quoted the extract last herein above set out from the decision in Ex parte Yarbrough.

In Swafford v. Templeton, 185 U. S. 487, 22 Sup. Ct. 783, 46 L. Ed. 1005, the court reiterates the same doctrine. Swafford brought suit against the defendants to recover damages for wrongfully refusing to permit him to vote at a national election for a member of the House of Representatives, held on November 6, 1900. The declaration expressly charged that the plaintiff was a white man, that he was a duly qualified voter at the place where he sought to vote, and as such had the right to vote for members of Congress, and that he had been illegally deprived of such right by the defendants when serving as election officers at such election. The court below dismissed the action on the ground that it was not one within its jurisdiction. The Supreme Court said, Mr. Justice White writing the opinion:

"The sole question is: Did the Circuit Court err in dismissing the action, on the ground that it was not one within the jurisdiction of the court? An affirmative answer to this question is rendered necessary by the decision in Wiley v. Sinkler, 179 U. S. 58 [21 Sup. Ct. 17, 45 L. Ed. 84]."

After stating the case of Wiley v. Sinkler, 179 U. S. 58, 21 Sup. Ct. 17, 45 L. Ed. 84, and the decision of the court thereon, Justice White proceeds:

"It is manifest from the context of the opinion in the case just referred to that the conclusion that the cause was one arising under the Constitution of the United States was predicated on the conception that the action sought the vindication or protection of the right to vote for a member of Congress, a right, as declared in Ex parte Yarbrough, 110 U. S. 655, 664 [4 Sup. Ct. 152, 28 L. Ed. 274], 'fundamentally based upon the Constitution of the United States, which created the office of member of Congress, and declared that it should be elective, and pointed out the means of ascertaining who should be electors.' That is to say, the ruling was that the case was equally one arising under the Constitution or laws of the United States, whether the illegal act complained of arose from a charged violation of some specific provision of the Constitution or laws of the United States, or from the violation of a state law which affected the exercise of the right to vote for a member of Congress, since the Constitution of the United States had adopted, as the qualifications of electors for members of Congress, those prescribed by the state for electors of the most numerous branch of the Legislature of the state."

In Felix v. United States, 186 Fed. 685, 108 C. C. A. 503, the Circuit Court of Appeals of the Fifth Circuit decided the exact question which we are now considering. Felix and others were indicted and convicted of a conspiracy to injure and oppress certain citizens of the United States in the exercise of a right secured to them by the Consti-

tution and laws of the United States, by depriving them of the right to vote for a member of Congress. The court said:

"The statute [section 5508] on which the first count of the indictment is based is applicable to conspiracies to injure, oppress, threaten, or intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same. The statute is applicable for the protection of 'any citizen' without other limitation. The rights or privileges protected by the statute are limited. The statute embraces and protects only those which are secured to the citizen 'by the Constitution or laws of the United States.' The indictment charges that the defendants with others conspired to injure, oppress, threaten, and intimidate certain voters in the free exercise and enjoyment of the right and privilege to vote for members of the House of Representatives of the United States. It is contended by the learned counsel for the accused that the right or privilege to vote at an election for a member of the House of Representatives of the United States is not a right or privilege secured by the Constitution or laws of the United States, and that, therefore, such right is not within the meaning of section 5508 (section 19). That contention presents the controlling question in this case."

The court held that the right to vote for a member of Congress was fundamentally based upon the Constitution of the United States, which created the office and declared that it should be elective, citing article 1, section 2, of the Constitution of the United States, Ex Parte Yarbrough, Wiley v. Sinkler, and Swafford v. Templeton, supra.

In United States v. Stone et al. (D. C.) 188 Fed. 836, the District Court for the District of Maryland, Judges Morris and Rose sitting, decided that the right to vote at a congressional election is a right secured by the Constitution and laws of the United States, and sustained an indictment under section 19 for a conspiracy to deprive certain voters of that right.

The cases mainly relied upon by counsel for the demurring defendants to sustain their contention are United States v. Reese, 92 U. S. 214, 23 L. Ed. 563, United States v. Cruikshank, 92 U. S. 542, 23 L. Ed. 588, and James v. Bowman, 190 U. S. 127, 23 Sup. Ct. 678, 47 L. Ed. 979. The Reese Case was pressed upon the Supreme Court in Ex parte Yarbrough, and held by that court not to affect the decision in that case. To state what was involved in the cases of United States v. Reese and United States v. Cruikshank would unduly extend this opinion, nor is this necessary in view of the case next to be cited.

In the case of Lackey v. United States, 107 Fed. 114, 46 C. C. A. 189, 53 L. R. A. 660, the Circuit Court of Appeals of the Sixth Circuit, composed of Lurton, Day, and Severens, Circuit Judges, the opinion being written by Judge Lurton, the court had before it the question of the validity of section 5507, providing that:

" 'Every person who prevents, hinders, controls, or intimidates another from exercising or in exercising the right of suffrage, to whom that right is guaranteed by the fifteenth amendment to the Constitution of the United States, by means of bribery or threats,' etc., shall be punished, etc."

In the opinion the court discusses and distinguishes the cases relied upon here by the government and those relied upon by the demurring defendants, and said:

"Both U. S. v. Reese and U. S. v. Cruikshank were decided upon the ground that discrimination on account of color, race, etc., is essential to the commission of any offense against the United States at a state election. In Ex parte Yarbrough * * * this limitation was held not to apply at elections where congressmen were to be chosen, because the right to vote for congressmen is a right secured by and dependent upon the Constitution of the United States, the office being created and the qualification of voters being determined by that instrument."

Nor does the case of James v. Bowman affect the question here. In that case the defendants were indicted for the violation of section 5507. The court said:

"The single question presented for our consideration is whether section 5507 can be upheld as a valid enactment, for, if not, the indictment must also fall, and the defendant was rightfully discharged. On its face the section purports to be an exercise of the power granted to Congress by the fifteenth amendment, for it declares a punishment upon any one who by means of bribery prevents another from exercising that right. But that amendment relates solely to action 'by the United States or by any state,' and does not contemplate wrongful individual acts."

In other words, section 5507 plainly purported to punish the purely individual action of persons in preventing, hindering, controlling, or intimidating another from exercising, or in exercising, the right of suffrage, to whom that right is guaranteed by the fifteenth amendment to the Constitution of the United States, and as the fifteenth amendment simply provided that "the right of the citizens of the United States to vote shall not be denied or abridged by the United States or by any state, on account of race, color, or previous condition of servitude," it was ruled that this amendment did not authorize the enactment of section 5507, which was also the ruling in Lackey v. United States, supra.

The right to vote for a member of Congress being a right secured by the Constitution and laws of the United States, it is perfectly plain that the right to vote for a United States Senator, since the adoption of the seventeenth amendment to the United States Constitution and the passage by Congress of the act of June 4, 1914, is also a right secured by the Constitution and laws of the United States. If the right to vote for a Representative in Congress or a Senator of the United States is a right secured by the Constitution and laws of the United States, then it appears that the right and privilege to serve as a member of an election board where such Representative or Senator is to be elected is likewise a right or privilege secured by the Constitution and laws of the United States. If a man has a right to vote, he has a right to have his vote received and counted by the proper election officers; otherwise, the right to vote is but an empty right. The act of Congress of June 4, 1914, as we have seen, provides, so far as this state is concerned, in the election of a United States Senator:

"The procedure shall be in accordance with the laws of such state respecting the ordinary executive and administrative officers thereof who are elected by the vote of the people of the entire state."

Thus the law of Congress expressly provides that there shall be election inspectors, judges, and poll clerks at the election where a Senator is to be elected, as provided by the election laws of the state of Indiana, and the right of the duly selected and properly qualified persons under the law of Indiana to act as such election officers at an election where a United States Senator is to be elected, is a right secured by the Constitution and laws of the United States. As we have seen, the Supreme Court in Swafford v. Templeton, supra, used this language:

"The ruling [in Ex parte Yarbrough] was that the case was equally one arising under the Constitution or laws of the United States, whether the illegal act complained of arose from a charged violation of some specific provision of the Constitution or laws of the United States, or *from the violation of a state law which affected the exercise of the right to vote for a member of Congress.*"

As the laws of Indiana provide for election inspectors, judges, and poll clerks, and prescribe their duties, and as the act of June 4, 1914, provides that the election of United States Senators shall be in accordance with those laws, the laws of the state in this regard, therefore, affect the exercise of the right to vote for such Senators. Numerous decisions of the Supreme Court support this view. In United States v. Waddell, 112 U. S. 76, 5 Sup. Ct. 35, 28 L. Ed. 673, the right to perfect a homestead entry under a federal law was held to be a right or privilege within section 19. In Re Quarles, 158 U. S. 532, 15 Sup. Ct. 959, 39 L. Ed. 1080, it was held that the right to aid in the execution of federal laws, by giving information to the proper authorities of the violation of those laws, was a right or privilege within section 19; and in Motes v. United States, 178 U. S. 458, 20 Sup. Ct. 993, 44 L. Ed. 1150, the Supreme Court said:

"It was the right and privilege of Thompson, in return for the protection he enjoyed under the Constitution and laws of the United States, to aid in the execution of the laws of his country by giving information to the proper authorities of violations of those laws. That right and privilege may properly be said to be secured by the Constitution and laws of the United States. And it was competent for Congress to declare a conspiracy to injure, oppress, threaten, or intimidate a citizen because of the exercise by him of such right or privilege to be an offense against the United States."

In Logan v. United States, 144 U. S. 263, 12 Sup. Ct. 617, 36 L. Ed. 429, the Supreme Court held that the right to safety and protection while in custody of federal officers was a right and privilege secured by the Constitution and laws of the United States. In United States v. Davis (C. C.) 103 Fed. 457, defendants were indicted under section 19 for conspiring to prevent a United States marshal from making a lawful arrest. It was held that the right of the marshal to make the arrest on legal process was a right secured by the Constitution and laws of the United States.

[2] Is this first count bad for duplicity? It charges a single conspiracy or combination to commit several crimes. This does not make the count multifarious or bad for duplicity. In State v. Kennedy, 63 Iowa, 200, 18 N. W. 885, it was held:

"A conspiracy is but a single offense, even though it aims at the commission of several distinct crimes; and an indictment charging such a conspiracy is not demurrable for duplicity."

In that case the court said:

"The crime of conspiracy consists in the unlawful and corrupt agreement of the parties. It is entirely distinct from the crimes or unlawful acts which the parties have in view when they enter into the conspiracy, or the object which they intend to accomplish in pursuance of it. The crime is complete whenever the agreement is entered into, and it is not essential to it that any overt act be committed in pursuance of it. Hence the parties who enter into a conspiracy are, by that act, guilty of but one offense, whether their agreement is to commit one crime or many crimes. 2 Bish. Crim. Law, § 192; State v. Sterling, 34 Iowa, 443. The indictment before us, while it alleges that the parties conspired to commit more than one crime, charged but one conspiracy." ·

In Noyes v. State, 41 N. J. Law, 418, it is held:

"An indictment charging a single conspiracy to commit two or more crimes would not be open to the exception of being double."

In disposing of the contention that the indictment in that case was double, the court said:

"But the fundamental fallacy in the position on the part of the defense consists in this: That it confounds the crime, which is the conspiracy, with the objects of the conspiracy. A combination to commit several crimes is a single offense, and the offense can always be laid according to the truth. No matter how many violations of law may be concerted by the confederates, if the concert take place at one time, the crime is single. Therefore in this case, if it were the fact that these conspirators on a single occasion confederated to violate the law in question in two distinct particulars, with respect to such combination, the criminal act was a unit, and it appears as such on the face of this indictment."

In State v. Nugent, 77 N. J. Law, 84, 71 Atl. 485, it is held:

"An indictment for conspiracy is not multifarious because charging a design having a multitude of objects."

To the same effect is the case of People v. Herlihy, 66 App. Div. 534, 73 N. Y. Supp. 236.

[3] The second count of the indictment is based upon that part of section 37 of the Criminal Code which makes it a crime for two or more persons to conspire "to defraud the United States in any manner or for any purpose." Attention is at once arrested by the broad language here used. The manner of defrauding is not material, for the statute says in any manner; nor is the purpose material, for the statute says for any purpose. The question then comes to this: Is a conspiracy to corrupt and debauch voters at an election where a United States Senator and a member of Congress are to be elected, and to fraudulently manipulate and corrupt and debauch the election itself, as averred in this second count, a conspiracy to defraud the United States? The far-reaching consequences of so holding require us to keep well within the principles of the decided cases. That the government is interested in keeping the elections in which members of Congress and Senators are chosen free from the influence of violence and corruption, and that Congress has the right and power to enact legislation appropriate to accomplish such purpose, has been declared

by the Supreme Court. In Ex parte Yarbrough, heretofore referred to, the Supreme Court said:

"It is as essential to the successful working of this government that the great organisms of its executive and legislative branches should be the free choice of the people as that the original form of it should be so. In absolute governments, where the monarch is the source of all power, it is still held to be important that the exercise of that power shall be free from the influence of extraneous violence and internal corruption. In a republican government, like ours, where political power is reposed in representatives of the entire body of the people, chosen at short intervals by popular elections, the temptation to control these elections by violence and by corruption is a constant source of danger. Such has been the history of all republics, and, though ours has been comparatively free from both these evils in the past, no lover of his country can shut his eyes to the fear of future danger from both sources. If the recurrence of such acts as these prisoners stand convicted of are too common in one quarter of the country, and give omen of danger from lawless violence, the free use of money in elections, arising from the vast growth of recent wealth in other quarters, presents equal cause for anxiety. If the government of the United States has within its constitutional domain no authority to provide against these evils—if the very sources of power may be poisoned by corruption, or controlled by violence and outrage, without legal restraint—then, indeed, is the country in danger, and its best powers, its highest purposes, the hopes which it inspires, and the love which enshrines it, are at the mercy of the combinations of those who respect no right but brute force on the one hand, and unprincipled corruptionists on the other."

It has been decided many times by the Supreme Court and by other federal courts that it is not essential to charge or prove an actual financial or property loss to make a case under the branch of the statute which we are now considering. Haas v. Henkel, 216 U. S. 462, 480, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112.

This second count is sustained by the case of Curley v. United States, 130 Fed. 1, 64 C. C. A. 369. The Curley Case was decided by the Circuit Court of Appeals of the First Circuit. A petition for a writ of certiorari was denied by the Supreme Court. The decision of the Court of Appeals thus has the sanction and approval of the Supreme Court of the United States. The prosecution in the Curley Case was under section 37. The first count of the indictment charged that one Hughes, desiring to procure an appointment as letter carrier, a position in the classified civil service of the United States, and for the purpose of procuring the placing of his name on the list of persons eligible to appointment as letter carriers, and for the purpose of defrauding the United States, unlawfully agreed with Curley that Curley should impersonate Hughes at a civil service examination and do all acts required by the board of examiners, and sign the name of Hughes to such examination papers as should be delivered to Curley for examination while he should impersonate Hughes; that Curley, in pursuance of said conspiracy, gained entrance to the examination, and for the purpose of defrauding the United States did certain things to effect the object of the conspiracy. This first count is based upon that part of section 37 which makes it a crime for two or more persons to conspire to defraud the United States. In considering the sufficiency of that count, the court said:

"The principal contention of the defendants here is that the word 'defraud,' in its ordinary common-law acceptation, has reference to property and property rights, and the case largely, and perhaps wholly, depends upon the sense in which the word 'defraud' was used in the statute under consideration. Was it intended to limit the scope of the statute to frauds upon property and property rights of the government, or was it intended to use the word in a broader sense, and for the protection of intangible rights, privileges, and functions of the government?"

After a full discussion of this question, the court held the first count of the indictment in that case good. In the course of its opinion the court said:

"It is, perhaps, not going too far to say that this section is generic in terms, generic in the sense of including in the first part of the section all conspiracies to commit offenses against the United States, therefore all of a class, and then, under an enlarged scope, embracing all conspiracies to defraud the United States in any manner or for any purpose. It is generic in the sense of including all conspiracies to defraud, thus covering the whole subject of fraudulent conspiracies against the government—conspiracies to wrong the government through fraud and deception not constituting an offense, as well as conspiracies to commit offenses against the government."

And again:

"The language of the statute in question is very broad—'if two persons shall conspire to defraud,' etc. Now, it is, we think, not only reasonable, but the duty is upon us, in considering this statute, to have in mind the object of government in respect to a statute of this kind, as we would have in mind the object of a statute directing itself against wrongs destructive of individual property rights. The chief aim of government being that of protection and service, it may safeguard itself against conspiracies or combinations, or acts intended to impair its proper administration, or conspiracies to impair any of the functions of the government. It may declare it unlawful to combine for the purpose of doing any act which obstructs or interferes with the operations of government or any of its departments. The government may unquestionably safeguard itself against being defrauded out of its right to administer an intelligent and honest service in the interests of the people."

And again:

"It is an inherent and unquestionable right of the government to administer itself according to law, and, while all citizens have the right and are at liberty to become an instrument of the government under the rules and regulations established by law, they are not at liberty and have not the right to subvert the lawful purposes of the government through a conspiracy to attain government power and emolument by means of fraudulent acts calculated and intended to defraud and deceive the government in respect to its right to administer the mail service according to law. This results from the fundamental rule that the rights and liberties of a people may be regulated by law."

And again:

"The general purpose of the legislation, as well as the general intent of the statute, was to protect the government from impositions through conspiracies to defraud or cheat. The purpose was broad enough, therefore, to include fraudulent conspiracies to injure the government in respect to its rights and privileges as well as in respect to its property."

In Haas v. Henkel, 216 U. S. 462, 30 Sup. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112, the Supreme Court has spoken directly upon the question here involved. In that case the court had before it the suffi-

ciency of indictments charging a conspiracy to commit an offense against the United States and indictments charging a conspiracy to defraud the United States. In the latter indictments the conspiracy charged was averred to have been formed between one Haas, one Theodore Price, and one Edwin S. Holmes, Jr., who was an associate statistician in the Department of Agriculture. The charge was that these three defendants conspired to defraud the United States by secretly obtaining information from Holmes, which he should acquire in his official character as associate statistician, and should, in violation of his official duty, give out secretly to his co-conspirators information as to the probable contents of certain official cotton crop reports in advance of the time when these reports were to be promulgated according to law. The court said:

"The indictments are of such great length that it is not feasible to set them out in full or to state the substance of their several counts. It is for the purposes of this case enough to say that it is averred that the Department of Agriculture includes a Bureau of Statistics established by law; that one of the governmental functions exercised by that department, particularly through the statistical bureau, is the acquirement of detailed information from time to time in respect to the condition of the cotton crop of the country; that this information comes through thousands of correspondents, some official and others not, through the reports of local agents scattered through the cotton region and through traveling representatives of the department; from these and other sources a report is made estimating acreage, condition and the probable size of the crop; comparisons with former reports are made, and every explanation furnished which may throw light upon the present condition and prospect of the growing crop; that the purpose is to complete and promulgate at stated times fair, impartial, and reliable reports, and that said reports are issued about the 3d day of the months of June, July, August, September, October, and December; that the information thus officially acquired and compiled and the estimates thereon are of value and do greatly affect the market price of the crop; that such reports are required to be submitted to and approved by the Secretary of Agriculture before publication, and that under the custom, practices, and regulations of the Secretary of Agriculture all officers and employés are required to keep secret the information so gathered, and from in any way divulging same or giving out any information forecasting such report in advance of its official approval and promulgation. It is averred that the said Holmes was an employé or an official in said Department, and in the Bureau of Statistics; that by virtue of his duty as such official and assistant statistician he acquired much of the information upon which such reports are based, and, as an official, came into knowledge of the probable contents of the regular reports; that neither Haas nor Price had any official connection and were not authorized to obtain information about such reports in advance of their promulgation; that the conspiracy was to obtain such information from Holmes in advance of general publicity and to use such information in speculating upon the cotton market, and thereby defraud the United States by defeating, obstructing, and impairing it in the exercise of its governmental function in the regular and official duty of publicly promulgating fair, impartial, and accurate reports concerning the cotton crop. * * *

"Do the counts which charge a conspiracy to defraud the United States charge any offense? The authority for the indictments charging a conspiracy to defraud is section 5440, Rev. Stat. Its language is plain and broad: 'If two or more persons conspire * * * to defraud the United States in any manner or for any purpose, and one or more of such parties do any act to effect the object of the conspiracy, all the parties to such conspiracy shall be liable,' etc. These counts do not expressly charge that the conspiracy included any direct pecuniary loss to the United States, but as it is averred that the acquiring of the information and its intelligent computation,

with deductions, comparisons, and explanations involved great expense, it is clear that practices of this kind would deprive these reports of most of their value to the public and degrade the Department in general estimation, and that there would be a real financial loss. But it is not essential that such a conspiracy shall contemplate a financial loss or that one shall result. The statute is broad enough in its terms to include any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of government. Assuming, as we have, for it has not been challenged, that this statistical side of the Department of Agriculture is the exercise of a function within the purview of the Constitution, it must follow that any conspiracy which is calculated to obstruct or impair its efficiency and destroy the value of its operations and reports as fair, impartial, and reasonably accurate, would be to defraud the United States by depriving it of its lawful right and duty of promulgating or diffusing the information so officially acquired in the way and at the time required by law or departmental regulation. That it is not essential to charge or prove an actual financial or property loss to make a case under the statute has been more than once ruled"

—citing cases, and among others Curley v. United States, 130 Fed. 1, 64 C. C. A. 369.

If any conspiracy which is calculated to obstruct or impair the efficiency and destroy the value of the operations and reports of the Bureau of Statistics of the Department of Agriculture as fair, impartial, and reasonably accurate, would be to defraud the United States by depriving it of its lawful right and duty of promulgating or diffusing the information so officially acquired in the way and at the time required by law or departmental regulation, it is perfectly plain that a conspiracy which is calculated to obstruct and impair, corrupt, and debauch an election where Senators and Representatives in Congress are to be elected, would be to defraud the United States by depriving the government itself of its lawful right to have such Senators and Representatives elected fairly and in accordance with the law.

[4] But if the averment of a property loss to the government were essential, this count of the indictment alleges that one of the objects of the conspiracy was to secure for a person not duly elected a member of the House of Representatives, the annual salary of $7,500 provided as compensation for a duly elected member of such House.

[5] In count 3 the defendants are charged with conspiring to commit an offense against the United States; that is, the offense denounced by section 215 of the Criminal Code, commonly spoken of as the use of the mails in a scheme to defraud. It is to be observed that by section 215 Congress does not attempt to punish the perpetration of the scheme or artifice to defraud, whether such scheme or artifice be a crime against the state or the United States. It merely prohibits the use of the mails "for the purpose of executing such scheme or artifice, or attempting so to do."

The conspiracy or combination is properly averred in this count, and the only question that can arise on it is whether the acts which the defendants are charged with conspiring to do constitute the offense denounced by section 215. The language of this section is also very broad. It says "any scheme or artifice to defraud." This count in apt words charges that the defendants devised a scheme and artifice to obtain money from certain persons by false representations, which false representations were promises of immunity from prosecutions for

crime, which promises the defendants had no power to make, and further, by the use of the money thus obtained, to debauch an election, and cheat and defraud a certain candidate for judge out of his election, and prevent the majority of votes from being rightly counted in his favor, and wrongfully count the majority of votes in favor of a candidate who would not be elected, and fraudulently foist a person who would not be elected upon the state of Indiana, and thereby cheat the state out of the annual salary payable to such judge. It is further averred that the intention of the defendants was to place, and cause to be placed, a large number of letters in the United States post office at the city of Terre Haute, in said district, for the purpose of executing said scheme and artifice.

Count 4 is based on section 215 alone. It charges that the defendants devised a certain scheme and artifice to defraud, and for obtaining money by means of false and fraudulent pretenses, which scheme and artifice to defraud is the same as that set out in count 3, though described in somewhat different language, and that on the 25th day of October, 1914, "for the purpose of executing said scheme and artifice, and attempting so to do," the defendant Roberts placed, and caused to be placed, in the United States post office at Terre Haute, in said district, a certain letter, describing it, and that the other defendants, with the same fraudulent intent and purpose, aided and abetted Roberts in so placing said letter in said post office.

The demurrers should be overruled; and it is so ordered.