### CHAPMAN et al. v. KING.
### KING v. CHAPMAN et al.
#### No. 11494.

Circuit Court of Appeals, Fifth Circuit.

March 6, 1946.

Writ of Certiorari Denied April 1, 1946.
See 66 S.Ct. 905.

A. Edward Smith, of Columbus, Ga., and Charles J. Bloch, of Macon, Ga., for Joseph E. Chapman, Jr., et al.

Julian Eugene Cook, Atty. Gen. of Georgia, and Claude Shaw, Asst. Atty. Gen. of Georgia, for Joseph E. Chapman, Jr., et al. as amicus curiae.

Harry S. Strozier, of Macon, Ga., and Oscar D. Smith, of Columbus, Ga., Thurgood Marshall, of New York City, and A. P. Tureaud and Jos. A. Thornton, both of New Orleans, La., for Primus E. King as amicus curiae.

Before SIBLEY, HOLMES, and McCORD, Circuit Judges.

SIBLEY, Circuit Judge.

The appellee King, a citizen of the United States and of the State of Georgia and a qualified and registered voter in Muscogee County according to the laws of Georgia, offered to vote in a Democratic Primary in that County in which nominees for the United States Senate and House of Representatives as well as for State offices were being chosen, and was denied the right by the appellants, who were in charge of the primary as the County Democratic Executive Committee, solely because he was of the colored or negro race. He sued for damages under the Civil Rights Act, 8 U.S.C.A. §§ 31 and 43, for the deprivation of a right secured by the Constitution of the United States, and especially by the Fifteenth Amendment. The facts were stipulated, including the amount of damages, if any are recoverable. The District Judge made an exhaustive review of the Georgia statutes touching party primary elections (King v. Chapman et al., D.C., 62 F.Supp. 639, 650) and concluded as a matter of law that this primary election "was by law an integral part of the electoral process of the State of Georgia" and the holding of it "was action by the State of Georgia acting through the Democratic Party as its instrumentality," and that King's right to vote was withheld in violation of the Fourteenth, Fifteenth and Seventeenth Amendments of the Constitution, and thereupon entered judgment for the stipulated damages. The defendants have appealed. King took an appeal also on the ground that the judgment was favorable to him only as to his right to vote for nominees for United States Senator and Representatives, but that he was equally entitled to vote for nominees for State offices.

1. A motion is made to dismiss King's appeal on the ground that he won his case, and has no cause to appeal. We agree. Neither in the facts stipulated, which the court found to be the facts in the case, nor in the conclusions of law, nor in the judgment is any such distinction drawn. The statute which is sued on (8 U.S.C.A. § 31) makes no difference between elections touching State offices and those touching federal offices, but applies in terms to all elections by the people, and the Fifteenth Amendment, to enforce which the statute was made, is broad enough to include them all. King has no ground to complain against the judgment and his appeal is dismissed.

2. George Washington in his public addresses decried parties and factions in public affairs, and the electoral college as originally set up in the Constitution did not fit party choices of President and Vice President. But parties soon arose, the Constitution was changed as to the electoral college by the Twelfth Amendment, and party organization is now fully recognized in political affairs, both State and federal. A party's candidates were at first chosen in caucuses of its leaders, those for President sometimes by the Senators and Congressmen in Washington. Mass meetings were also used to nominate local candidates, or to choose delegates to party conventions which framed platforms and nominated candidates. Latterly, in order to give the party voters a direct voice in the choice of nominees, the party primary election arose

and is much used. The primaries do not and cannot elect anyone to office. A vote therein is not strictly a vote in an election. The potency and importance of the primary lies in the pledge of those who participate in it to support and vote for the nominee in the election to follow. This pledge is generally understood, is often expressed in the "rules of the primary," and has sometimes been reinforced by statute. In the present case the primary was appointed to be held July 4, 1944, by the Democratic Executive Committee of the State, according to the practice of the party; and in the call it was provided: "All white electors who are Democrats and qualified to vote in the General Election and who in good faith pledge themselves to support the Democratic candidates for all the offices to be voted on this year, are hereby qualified to vote in said primary." And it is agreed that King was a proper voter except that he was not white, but was a negro, and that he was excluded for that reason alone.

Now the federal immigration laws frown on anarchists and on organizations which advocate opposition to all government or the overthrow of the government of the United States by force or violence, 8 U.S. C.A. § 137; but we are advised of no statute, State or federal, which undertakes to limit the right of citizens who form a political party to select those who shall participate in it. Nor is there any statute which prohibits those who do participate in a party caucus, mass meeting or election from agreeing to support the result thereof. Accordingly there may be parties composed wholly of whites, or wholly of colored people, or wholly of Jews, or of men, or of women. In a pure party activity by such parties there would result an exclusion from voting in that activity of those of another race or sex, but it would not be a

denial of the right to vote "at an election by the people in any State, Territory [or] county * * * or other territorial subdivision" in the words of 8 U.S.C.A. § 31, nor within the meaning of the Fifteenth or Nineteenth Amendments. The persons so excluded could freely vote in the election by the people in the territorial subdivision according to the statute and the Amendments, and win the election if they could muster a majority. There is indeed no way for the party to compel those who voted in its primary to support the nominee.[1] Their pledge to do so might even be thought contrary to public policy in a court of law, because hindering the free expression in the election of the individual voter's judgment and will. Certainly the exclusion practiced in the primary by the party would not be an exclusion by the United States of a State prohibited by the Amendments;[2] nor "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory", as is necessary under the language of 8 U.S.C.A. § 43[3] for a recovery of damages in this suit.

3. But the State of Georgia has not left party primaries wholly to the various parties, but has recognized the practical potency of the party pledge, and the great importance to the public of the results of a primary held by a numerous party, and has protected and regulated such primaries almost exactly in the same way as it has regulated elections by the people. Much, perhaps most, of this regulation we think in nowise commits the State to the party practices. For example, the forbidding the sale or furnishing of intoxicants on election days, whether the election is a party primary or an election by the people, Georgia Code, § 58-609, is for the peace and good order of the community, an ordinary exercise of police power. So are the stat-

---

[1] Compare Love v. Wilcox, 119 Tex. 256, 29 S.W.2d 515, 524, 70 A.L.R. 1484.

[2] Fifteenth Amendment. "Section 1. The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

"Section 2. The Congress shall have power to enforce this article by appropriate legislation."

Nineteenth Amendment. "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of sex.

"Congress shall have power to enforce this article by appropriate legislation."

[3] 8 U.S.C.A. § 43. "Civil action for deprivation of rights.

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. R.S. § 1979."

utes which are designed to prevent frauds, for the State can rightly concern itself in the prevention of fraud in any sort of proceeding. And the constitutional and statutory provisions forbidding voting in party primaries, mass meetings, and conventions by persons who are not by the State law qualified to vote in elections are aimed against the absurdity of having nominations controlled by people who cannot vote. They protect the State elections against an abuse, and standing alone would not show an adoption of the primary by the State. And it must be observed that the Georgia primary laws are not specially applicable to any particular party, but to all parties which may call a primary. The State does not require a primary in any case, nor itself choose the primary managers, nor bear any of the expenses of the primary, except that a few acts are required of the Ordinaries and Clerks of Court having to do with the prevention of frauds and mistakes and the discovery of them on a recount. The party attends to all these matters, and to the consolidation of the returns and declaration of the result.

4. Nor do we think the agreed fact that for the past few quadrenniums the Democratic party has carried the presidential election in Georgia, or the fact that the nominees in this particular primary were afterwards elected, is of great legal significance. It is a matter of public knowledge that it is not always so. Some counties in Georgia consistently elect Republican county officers. The Populist party not long ago about equalled the Democratic party in strength in the State and furnished a candidate for the Vice Presidency in Thos. E. Watson. The writer recollects one year in which his own County went Republican for President, Democratic for Congressman, and Populist for State and County officers. Not often, if ever, have a majority of the qualified voters participated in a primary, so as to prove the participants able to control the election. It really cannot be foretold with certainty at the time of a primary who will win in the final election; nor would it be a sound legal test to say that the action of a party was or was not State action according to the *probability* of that party's success in the succeeding election, or according to the *actual result* of it.

5. We have of course considered the decisions in United States v. Classic, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, a criminal case in which the Louisiana primary laws were discussed; and Smith **v.** Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110, a civil suit like this one in which the State of Texas was held by its primary laws to have adopted the primary election as a part of the State's election machinery. The differences between the Georgia laws touching primaries and those of Louisiana and Texas seem to us to be fundamental, especially in that the Georgia laws do not require any party to hold a primary, do not require a party candidate to be in any case chosen by a primary, nor require the State to pay the expenses of the primary if a party calls one; and they permit persons not chosen by any party to have their names put on the official ballots at the election. The cited cases therefore do not decide this one. But there are features of the Georgia laws which seem to us to show that the State, when any party calls a primary, associates itself with the party in holding it, and adopts the result as authenticating the successful candidate to be the nominee of that party for the official election ballot. The State collaborates in these ways: It prohibits anyone to participate in any primary or convention of any political party who is not a qualified voter. Georgia Code § 2-608, Constitution, Art. II, Sect. I, Par. 8. The State furnishes its list of registered voters and these voters alone are declared entitled to vote in primaries as well as in general elections. Georgia Code, § 34-405. And the State registrars are required to be at the court house during the voting hours of the primary as fixed by law § 34-2001a, to make corrections in the list, § 34-411 (Supplement). The State requires the party to select election managers, and requires each manager to take an oath that he will fairly and impartially and honestly conduct the election according to the provisions of law. § 34-3201. If a voter is challenged, they are required to administer to him an oath that he is duly qualified to vote *"according to the rules of the party,* and according to the election laws of this State." § 34-3202. All the laws in reference to the qualification of voters and their registration are applied to primaries, and "No person who is not a duly qualified and registered voter according to law and *who is not also duly qualified in accordance with the rules and regulations of the party holding the same,* shall be entitled to vote at any such primary election." § 34-3218. If the challenged

voter swears falsely, the State will punish him. § 34-9925. No one but a sworn manager can have any part in receiving or counting the votes. § 34-3205. The managers must turn over tally sheets, lists of voters, ballots and other election papers to the Clerk of the Superior Court to be kept under seal until the next grand jury meets if no contest is filed. § 34-3207. The managers are indictable for violation of their duty. §§ 34-9922, 34-9923. Generally all penal laws touching elections are extended to primaries, § 34-9933, Supplement; and § 34-9907.

Further, by the Act of 1917, Sections 34-3212 to 34-3218, the State has undertaken to control the method of determining who has been nominated in a primary for United States Senator, Governor, Statehouse officers and Justices of the Supreme Court and Court of Appeals, these being statewide elections, by saying that neither a majority nor a plurality of all votes cast shall nominate, but that a plurality of the votes in each county shall carry that county, and a majority of "county units" carried as therein defined, shall determine the nominee; and if no candidate carried a majority of the county units and there are but two candidates the one who received a majority of the popular votes shall be the nominee; but if there are more than two candidates and neither carried a majority of the county unit votes, there shall be a second primary between the two leading candidates whose result is to be determined on the same basis; with other elaborate provisions on further contingencies. This Act appears in large measure to take such primaries out of the control of the parties initiating them, and to substitute the State's will in determining the mode of choice of the party nominee. It is this Act which specifically declares that no one may vote who is not qualified according to the rules of the party. § 34-3218.

 We think these provisions show that the State, through the managers it requires, collaborates in the conduct of the primary, and puts its power behind the rules of the party. It adopts the primary as a part of the public election machinery. The exclusions of voters made by the party by the primary rules become exclusions enforced by the State and when these exclusions are prohibited by the Fifteenth Amendment because based on race or color, the persons making them effective violate under color of State law a right secured

by the Constitution and laws of the United States within the meaning of the statute which is here sued on.

The judgment is accordingly affirmed.