**RICE et al. v. ELMORE.**

No. 5664.

Circuit Court of Appeals, Fourth Circuit.

Dec. 30, 1947.

Irvine F. Belser and Christie Benet, both of Columbia, S. C. (W. P. Baskin, of Bishopville, S. C., Charles B. Elliott, of Columbia, S. C., P. H. McEachin, of Florence, S. C., J. Perrin Anderson, of Greenwood, S. C., W. Brantley Harvey, of Beaufort, S. C., Edgar A. Brown, of Barnwell, S. C.,

and Yancey A. McLeod, of Columbia, S. C., on the brief), for appellants.

Thurgood Marshall, of New York City (Harold R. Boulware, of Columbia, S. C., and Edward R. Dudley, of New York City, on the brief), for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

PARKER, Circuit Judge.

This is an appeal from a decree adjudging that Negroes are entitled to vote in Democratic primary elections in South Carolina and enjoining defendants, who conduct such elections, from denying to Negro electors the right to vote therein. Plaintiff, who has brought this as a class suit in behalf of all Negro electors similarly situated, is a Negro duly qualified to vote under the Constitution and laws of the State of South Carolina. He has been denied the right to vote in the Democratic primary of that state by rules promulgated by the Democratic Party limiting the right to vote in the primary to white persons. The defendants are officials of the Democratic Party of South Carolina, who have charge of the primary in the county and precinct where plaintiff resides.

The only question presented by the appeal is the correctness of the declaration as to the right to vote contained in the decree appealed from and the validity of the injunction therein granted. Plaintiff contends that the decree should be upheld under the Fourteenth and Fifteenth Amendments to the Constitution and the provisions of the Civil Rights Acts, 8 U.S.C.A. §§ 31, 43. Defendants contend that, because there has been no statutory regulation of primaries in South Carolina since the repeal in 1944, 44 St. at Large, p. 2231, of the statutes relating thereto, the constitutional limitations on state action relied on by plaintiff have no application and that there is consequently no jurisdiction in the court to grant declaratory or injunctive relief. They argue that defendants in the action complained of were acting, not as state officials, but as members of the Democratic Party, which, they say, is a voluntary political association which can exercise unrestricted choice of membership.

There is no dispute as to the facts, which are fully and fairly set forth in the opinion of the District Judge. See Elmore et al. v. Rice et al., D.C., 72 F.Supp. 516. They may be briefly summarized as follows:

For half a century or more the Democratic Party has absolutely controlled the choice of elective officers in the State of South Carolina. The real elections within that state have been contests within the Democratic Party, the general elections serving only to ratify and give legal validity to the party choice. So well has this been recognized that only a comparatively few persons participate in the general elections. In the election of 1946, for instance, 290,223 votes were cast for Governor in the Democratic primary, only 26,326 in the general election.

In South Carolina, as in most other states of the Union, the primary had become an integral part of the election machinery recognized and regulated by law. Article II, sec. 10, of the State Constitution of 1895 directed that the Legislature provide by law for the regulation of party primary elections, and pursuant thereto a complete set of primary laws had been adopted and were in effect when the Supreme Court of the United States decided the case of Smith v. Allwright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110, holding that the right to vote in a primary election held under state law might not be denied on the ground of race or color. Immediately following this decision, the then Governor of South Carolina convened the state legislature and recommended that it repeal all laws with relation to primaries with the avowed purpose of preventing voting by Negroes in the Democratic primaries of the state. Pursuant to this recommendation, the primary laws of the state were repealed and the Democratic primary was conducted thereafter under rules prescribed by the Democratic party. That the primary when conducted by the party fulfilled the same function in the election machinery of the state and was managed in practically the same way as when conducted under state law, does not admit of doubt. With respect to this, the District Judge, after describing the pro-

cedure when the statutes regulating the primary were in effect, went on to say [72 F.Supp. 525]:

"In 1944 substantially the same process was gone through, although at that time and before the State Convention assembled, the statutes had been repealed by action of the General Assembly, heretofore set out. The State Convention that year adopted a complete new set of rules and regulations, these however embodying practically all of the provisions of the repealed statutes. Some minor changes were made but these amounted to very little more than the usual change of procedure in detail from year to year. * * *

"In 1946 substantially the same procedure was used in the organization of the Democratic Party and another set of rules adopted which were substantially the same as the 1944 rules, excepting that the voting age was lowered to 18 and party officials were allowed the option of using voting machines, and the rules relative to absentee voting were simplified * * *."

The question presented for our decision is whether, by permitting a party to take over a part of its election machinery, a state can avoid the provisions of the Constitution forbidding racial discrimination in elections and can deny to a part of the electorate, because of race and color, any effective voice in the government of the state. It seems perfectly clear that this question must be answered in the negative.

The fundamental error in defendant's position consists in the premise that a political party is a mere private aggregation of individuals, like a country club,[1] and that the primary is a mere piece of party machinery. The party may, indeed, have been a mere private aggregation of individuals in the early days of the Republic, but with the passage of the years, political parties have become in effect state institutions, governmental agencies through which sovereign power is exercised by the people. Party primaries are of more recent growth. Originating in the closing years of the last century as a means of making parties more responsive to the popular will in the nomination of candidates for office, they had been adopted by 1917 in all except four of the states of the Union as a vital and integral part of the state election machinery. Encyclopedia of Social Sciences, vol. 6, p. 396. The relation of the primary to the election was well stated by Mr. Justice Pitney in his concurring opinion in Newberry v. United States, 256 U.S. 232, 285, 41 S.Ct. 469, 484, 65 L.Ed. 913, where he said: "It seems to me too clear for discussion that primary elections and nominating conventions are so closely related to the final election, and their proper regulation so essential to effective regulation of the latter, so vital to representative government that power to regulate them is within the general authority of Congress. It is matter of common knowledge that the great mass of the American electorate is grouped into political parties, to one or the other of which voters adhere with tenacity, due to their divergent views on questions of public policy, their interests, their environment, and various other influences, sentimental and historical. So strong with the great majority of voters are party associations, so potent the party slogan, so effective the party organization, that the likelihood of a candidate succeeding in an election without a party nomination is practically negligible. As a result, every voter comes to the polls on the day of the general election confined in his choice to those few candidates who have received party nominations, and constrained to consider their eligibility, in point of personal fitness, as affected by their party associations and their obligation to pursue more or less definite lines of policy, with which the voter may or may not agree. As a practical matter, the ultimate choice of the mass of voters is predetermined when the nominations have been made."

As primaries have become inbedded in the election machinery of the country,

[1] In summing up their argument, counsel for defendants say in their brief: "Plaintiff has no more right to vote in the Democratic primary in the State of South Carolina than to vote in the election of officers of the Forest Lake Country Club or for the officers of the Colonial Dames of America, which principle is precisely the same."

there has come gradually a recognition by the courts of the function they perform and the application to them of the laws relating to elections. In the Newberry case, supra, decided in 1921, the Supreme Court, by a bare majority, had held the Federal Corrupt Practices Act, 2 U.S.C.A. § 241 et seq., not applicable to a primary election held for United States Senator under a law adopted prior to the 17th Amendment. In United States v. Classic, 313 U. S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368, decided in 1941, however, it was expressly held that a primary was an election within the meaning of art. 1 sec. 4 of the Constitution and the court pointed out that the Newberry case could not be considered authority to the contrary. In Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L. Ed. 759, a Texas statute forbidding Negroes to participate in Democratic primaries was held violative of the 14th Amendment. Following that decision, the statute was repealed and a law enacted authorizing the Executive Committee of a political party to prescribe who might vote in its primaries, and under this the Democratic Executive Committee adopted a resolution limiting participation in the Democratic primary to white persons. The exclusion of Negroes from voting pursuant to this resolution was held violative of the 14th Amendment, in Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 487, 76 L.Ed. 984, 88 A.L.R. 458, the Court saying: "The test is not whether the members of the Executive Committee are the representatives of the state in the strict sense in which an agent is the representative of his principal. The test is whether they are to be classified as representatives of the state to such an extent and in such a sense that the great restraints of the Constitution set limits to their action." The Texas law was again amended to eliminate delegation of authority to the Executive Committee and thereupon the Democratic State Convention, without statutory authority for so doing, limited the right to participate in the Democratic primary to white persons. The exclusion of a Negro from voting in the Democratic primary pursuant to this action was held not violative of constitutional right in Grovey v. Townsend, 295 U.S. 45, 55 S.Ct. 622, 79 L.Ed. 1292, 97 A.L.R. 680; but Grovey v. Townsend was expressly overruled a few years later in Smith v. Allwright, supra, 321 U.S. 649, 64 S.Ct. 757, 765, 88 L.Ed. 987, 151 A.L. R. 1110, where the Court said:

"When primaries become a part of the machinery for choosing officials, state and national, as they have here, the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election. * * *

"The United States is a constitutional democracy. Its organic law grants to all citizens a right to participate in the choice of elected officials without restriction by any State because of race. This grant to the people of the opportunity for choice is not to be nullified by a State through casting its electoral process in a form which permits a private organization to practice racial discrimination in the election. Constitutional rights would be of little value if they could be thus indirectly denied. Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 876, 83 L.Ed. 1281.

"The privilege of membership in a party may be, as this Court said in Grovey v. Townsend, 295 U.S. 45, 55, 55 S.Ct. 622, 626, 79 L.Ed. 1292, 97 A.L.R. 680, no concern of a state. But when, as here, that privilege is also the essential qualification for voting in a primary to select nominees for a general election, the state makes the action of the party the action of the state."

■ It is true, as defendants point out, that the primary involved in Smith v. Allwright was conducted under the provisions of state law and not merely under party rules, as is the case here, but we do not think this a controlling distinction.[2] State law relating to the general election

---

[2] In King v. Chapman, D.C., 62 F. Supp. 639, it was held that, because the Democratic primary was an integral part of the electoral process of the State of Georgia, a Negro might not be excluded from voting therein. The judgment in favor of plaintiff was affirmed on appeal (Chapman v. King, 5 Cir., 154 F.2d 460, 463) in an opinion based on the ground that the state collaborated in the primary and put its power behind the rules of the party. The appellate court

gives effect to what is done in the primary and makes it just as much a part of the election machinery of the state by which the people choose their officers as if it were regulated by law, as formerly. Elections in South Carolina remain a two step process, whether the party primary be accounted a preliminary of the general election, or the general election be regarded as giving effect to what is done in the primary; and those who control the Democratic Party as well as the state government cannot by placing the first of the steps under officials of the party rather than of the state, absolve such officials from the limitations which the federal Constitution imposes. When these officials participate in what is a part of the state's election machinery, they are election officers of the state de facto if not de jure, and as such must observe the limitations of the Constitution. Having undertaken to perform an important function relating to the exercise of sovereignty by the people, they may not violate the fundamental principles laid down by the Constitution for its exercise. Cf. Steele v. Louisville & N. R. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173; Kerr v. Enoch Pratt Free Library, 4 Cir., 149 F.2d 212, 218. As said in the case last cited, "We know of no reason why the state cannot create separate agencies to carry on its work in this manner, and when it does so, they become subject to the constitutional restraints imposed upon the state itself."

■ Even though the election laws of South Carolina be fair upon their face, yet if they be administered in such way as to result in persons being denied any real voice in government because of race and color, it is idle to say that the power of the state is not being used in violation of the Constitution. As said in Yick Wo v. Hopkins, 118 U.S. 356, 373 374, 6 S.Ct. 1064, 1073, 30 L.Ed. 220, "Though the law itself be fair on its face, and impartial in appearance, yet if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution."

It is pointed out in the case of United States v. Classic, supra, 313 U.S. 299, 61 S.Ct. 1031, 1039, 85 L.Ed. 1368, that the right to vote in the primary and to have one's vote counted is to be protected, not only where state law has made the primary an integral part of the procedure of choice, but also where in fact it effectively controls the choice, as is unquestionably true in South Carolina. The Court said in that case: "From time immemorial an election to public office has been in point of substance no more and no less than the expression by qualified electors of their choice of candidates. Long before the adoption of the Constitution the form and mode of that expression had changed from time to time. There is no historical warrant for supposing that the framers were under the illusion that the method of effecting the choice of the electors would never change or that if it did, the change was for that reason to be permitted to defeat the right of the people to choose representatives for Congress which the Constitution had guaranteed. The right to participate in the choice of representatives for Congress includes, as we have said, the right to cast a ballot and to have it counted at the general election whether for the successful candidate or not. Where the state law has made the primary an integral part of the procedure of choice, *or where in fact the primary effectively controls the choice,* the right of the elector to have his ballot counted at the primary, is likewise included in the right protected by Article I, § 2. And this right of participation is protected just as is the right to vote at the election,

---

intimated that it did not consider "of great legal significance" some matters to which we attribute importance; but, while we have great respect for that court, we are, of course, not bound by these expressions of opinion. It is worth noting, however, that the court emphasized in its opinion that "it (the State of Georgia) adopts the primary as a part of the public election machinery." Where this is done as a matter of fact and custom, the presence or absence of statutory regulation of the primary does not seem a matter of controlling importance.

where the primary is by law made an integral part of the election machinery, whether the voter exercises his right in a party primary which invariably, sometimes or never determines the ultimate choice of the representative. *Here, even apart from the circumstance that the Louisiana primary is made by law an integral part of the procedure of choice, the right to choose a representative is in fact controlled by the primary because, as is alleged in the indictment, the choice of candidates at the Democratic primary determines the choice of the elected representative."* (Italics supplied.)

■ An essential feature of our form of government is the right of the citizen to participate in the governmental process. The political philosophy of the Declaration of Independence is that governments derive their just powers from the consent of the governed; and the right to a voice in the selection of officers of government on the part of all citizens is important, not only as a means of insuring that government shall have the strength of popular support, but also as a means of securing to the individual citizen proper consideration of his rights by those in power. The disfranchised can never speak with the same force as those who are able to vote. The Fourteenth and Fifteenth Amendments were written into the Constitution to insure to the Negro, who had recently been liberated from slavery, the equal protection of the laws and the right to full participation in the process of government. These amendments have had the effect of creating a federal basis of citizenship and of protecting the rights of individuals and minorities from many abuses of governmental power which were not contemplated at the time. Their primary purpose must not be lost sight of, however; and no election machinery can be upheld if its purpose or effect is to deny to the Negro, on account of his race or color, any effective voice in the government of his country or the state or community wherein he lives.

■ The use of the Democratic primary in connection with the general election in South Carolina provides, as has been stated, a two step election machinery for that state; and the denial to the Negro of the right to participate in the primary denies him all effective voice in the government of his country. There can be no question that such denial amounts to a denial of the constitutional rights of the Negro; and we think it equally clear that those who participate in the denial are exercising state power to that end, since the primary is used in connection with the general election in the selection of state officers. There can be no question, therefore, as to the jurisdiction of the court to grant injunctive relief, whether the suit be viewed as one under the general provision of 28 U.S.C.A. § 41(1) to protect rights guaranteed by the Constitution, or under 28 U.S.C.A. § 41(11) to protect the right of citizens of the United States to vote, or under 28 U.S.C.A. § 41(14) to redress the deprivation of civil rights.

There was no error and the judgment appealed from will be affirmed.

Affirmed.