**SOUTH et al. v. PETERS et al.**

**Civ. A. No. 3791.**

United States District Court
N. D. Georgia, Atlanta Division.
March 15, 1950.

Hamilton Douglas, Jr., Atlanta, Ga., Morris B. Abram, Atlanta, Ga., for plaintiffs.

Eugene Cook, Atty. Gen., State of Georgia, Powell, Goldstein, Frazer & Murphy, Atlanta, Ga., defendants.

Before SIBLEY, Circuit Judge, and DAVIS and ANDREWS, District Judges.

PER CURIAM.

This case, in which a principal relief sought is a permanent injunction to restrain the operation of a Statute of Georgia by restraining the action of the Secretary of State of Georgia, on the ground of the unconstitutionality of the Statute, came on, after due notice, for a final trial before a court of three judges, designated by the Chief Judge of this Circuit, on February 24, 1950. Oral and documentary evidence was presented, and it was agreed that the Court should consider the political history of the State and such other matters as are proper to be noticed judicially. Argument was had and time was taken by the Court to consider and for filing of briefs. The following findings of fact and conclusions of law are now announced, and decree entered.

## The Issues

The Georgia Statute attacked is the Act of August 14, 1917, now codified in Georgia Code of 1933 as Sections 34-3212 through 34-3218, relating to primary elections, and commonly known as the Neill Primary Act. The petitioners assert that they are citizens of the United States, resident in Georgia, and in Fulton County, registered voters, entitled to vote in popular elections, and members of the State Democratic Party. They allege that the Party will hold a primary election in 1950 to nominate its candidates for the offices of United States Senator from Georgia, Governor of the State, and other State offices; that the petitioners intend and are entitled to vote in the primary under the party rules and will be bound to support the nominees in the final election to be held in November, 1950; but that since they reside in Fulton County, by far the most populous county in the State, in consolidating the result of the primary and in certifying it to the Secretary of State who will place the names of the nominees on the official ballot for the final elections, under the rule of consolidation prescribed by the Neill Primary Act, to wit by "county units" instead of by a majority or plurality of the entire votes cast in the primary, the Executive Committee and its Chairman and the Secretary of State will deny to petitioners and their fellow voters in Fulton County the equal protection of law as against the voters in the less populous counties in violation of the Fourteenth Amendment and will fail to afford an election "by the people" of a United States Senator in violation of the Seventeenth Amendment of the Constitution.

The Provisions of the exhibited Act here specially pertinent are: "Whenever any *political party shall hold primary elections* for nomination of candidates for United States Senator, Governor, Statehouse officers, Justices of the Supreme Court and Judges of the Court of Appeals, such party or its authorities shall cause all candidates for nominations for said offices to be voted for on one and the same day throughout the State * * *. Candidates for nominations to the above-named offices who receive, respectively, the highest number of popular votes in any given county shall be considered to have carried such county, shall be entitled to the full vote of such county on the county unit basis, that is to say, two votes for each representative to which such county is entitled in the lower house of the General Assembly. If in any county any two or more candidates shall tie for the highest number of popular votes received, the county unit vote of such county shall be equally divided between the candidates so tying. All such county unit votes shall within 10 days after such primary be accurately consolidated by the chairman and secretary of the State committee of the political party holding such primary, and published in a newspaper published at the Capital, within three days after the completion of the consolidation, certified under the hands and seals of said chairman and secretary; and the candidates for said offices, respectively, who shall receive a majority of all the county unit votes, throughout the entire state, upon the basis above set forth, shall be declared by the State convention of the party holding such primary, or the permanent chairman, or other party authority, without the necessity of a formal ballot, to be the nominees of such party for the above-named offices, respectively". The Statute makes it the duty of the party authorities to see that the nominees shall be placed upon the ballots at the general election, which under other statutes is done by a certificate to the Secretary of State whose duty it is to prepare and distribute the form of the official ballots. The Neill Act further provides that if there should be a tie in consolidating the county unit votes, the candidate who received a majority of the popular vote shall be declared the nominee. Another provision is that in case there are more than two candidates for an office and no one receives a majority of the county unit votes, there shall be a prompt second primary between the two candidates who received the highest number of unit votes, with elaborate provisions as to its result.

The petition further alleges that since 1872 the nominees of the Democratic Party for United States Senator and Governor have won in the final election so that the

primary is practically equivalent to election; and that the laws touching primaries have been held to be part of the State's election machinery in Chapman et al. v. King, 154 F.2d 460, by the Court of Appeals for this Circuit. By an amendment the petition alleges that "the County Unit System has its origin in the antagonisms and hostilities of the rural political elements in Georgia against the urban centers and cities of Georgia" and "has the additional present effect and purpose of preventing the Negro and organized labor and liberal elements of urban communities, including Fulton County, from having their votes effectively counted in primary elections." The prayers are for a declaratory judgment that the Neill Act is unconstitutional, and for a permanent injunction against the defendants restraining them from carrying it out.

Answers are filed by Peters and Mrs. Blitch, as the Chairman and Acting Secretary of the Georgia State Democratic Party, and by the Secretary of State; which set up as grounds to dismiss that there is no substantial federal question or federal jurisdiction because the rights asserted arise only under the laws of Georgia; that the matter is political and not within equitable cognizance; that relief asked is not of private right, but must be sought in the legislative and political departments of government; that there is no present actual controversy for declaratory judgment; that no injury to complainants is apparent because their candidates may win; that Turman v. Duckworth, D.C., 68 F.Supp. 744; Id., 329 U.S. 675, 67 S.Ct. 21, 91 L.Ed. 596, is conclusive of the present case; that the suit against the Secretary of State is in effect one against the State without its consent; and that the State is an indispensable party. The answers admit many fact allegations of the petition but deny some. They assert that the State Democratic Party is not an entity that can be sued or enjoined; and that the Chairman and Secretary of the Executive Committee do not represent its other members; and that no primary has yet been called by the Committee. The figures as to population of Fulton and other counties are not admitted.

They deny that the "County Unit System" of voting is discriminatory or intended to be, and say it began with the organization of the State, and that it persists in many ways under successive State Constitutions. As to party nominations, it is alleged that they have from the earliest times been made in State Conventions in which the voting was by county units, and since primary elections came into use the same idea has merely been preserved; and in all instances but one under the Neill Act the county unit result has agreed with the general popular vote, both being certified to the Secretary of State and being thus of public record; and in most instances the candidate who carried Fulton County also got the majority of the county unit votes, so that it has not in fact operated to discriminate against the voters of Fulton County. The prayers are for dismissal of the petition and the refusal of relief.

## Findings of Fact.

The plaintiffs are citizens and registered voters of Fulton County, Georgia, associated with the State Democratic Party and entitled to vote in its primaries. There is nothing personal or peculiar to them which distinguishes them from other Democratic voters in Fulton County. The personal defendants have the offices alleged and represent respectively the functions alleged. The Secretary of State does not represent the State otherwise, nor appear for it. The Chairman and Acting Secretary of the Executive Committee represent the Democratic Party in the functions of their offices but do not appear to have been authorized by the other members of the party or the Executive Committee to represent them as litigants. The Party is a voluntary association whose membership is constantly changing and uncertain.

Fulton County is by far the most populous of the 159 Counties of the State. By the federal census of 1940 the population of Fulton County was 392,886 and that of the State was 3,123,723. The population of many of the counties was under 10,000. Exact figures at present have not been established by the evidence but it tends to show and we judicially know that since

1940 there has been no great change in the population of the State, but that a number of the smaller counties have lost population and those containing the larger cities have increased, and that Fulton County has had a large increase. About 1932, Fulton County annexed Campbell County and Milton County and a part of Cobb County, not by legislative act, but by a two-thirds popular vote of the counties absorbed. The City of Atlanta has grown greatly in size and population. In our best judgment the population of the State is now about 3,200,000, and that of Fulton County is about 460,000. For the purposes of this case, therefore, it may be said that Fulton County has about 14.4 per cent of the State's population. By the Constitution of the State, adopted in 1945 by general popular vote, there are 159 counties and can be no more. Article 11, § 1, par. 2. By Article III, Sect. III, par. 1, the representatives in the House of Representatives are apportioned: "to the eight counties having the largest population, three representatives each; to the thirty counties having the next largest population, two representatives each; and to the remaining counties, one representative each." There are thus 205 representatives, of which Fulton County has three. Under the Neill Act there are 410 county unit votes of which Fulton County has six. Fulton County has about 1.46 per cent of the county unit votes. It therefore has, assuming that Democratic registered voters throughout the State are in proportion generally to population, only about one-tenth of the voting power under the county unit plan that it would have otherwise. Some of the counties with two unit votes have a population as abnormally small as Fulton's is abnormally large. Chattahoochee County has had the major part of its territory taken from it by the United States in connection with the military establishment at Fort Benning, leaving a population estimated at less than 2,000; and Echols County which is a border county without a railroad and is undeveloped, has a population which has shrunk to about 2,400; so that their county unit votes are comparatively of greater effect. But Fulton's deprivation is not to be measured by these exceptions, but by what Fulton would have if there were no county unit system, as above set forth.

As to the origin of county unit organization in Georgia, and the political history of the State, the statements in the Twelfth Defense of the answers are substantially correct. Under the first State Constitution of 1777, Watkins Digest, Page 7, eight counties were established, in each of which annually were to be elected "representatives of the people" by the qualified voters, Liberty County electing fourteen representatives, Glynn and Camden two each, the other Counties ten each, and "the port and town of Savannah * * * four * * * to represent their trade" and "the port and town of Sunbury * * * two * * * to represent their trade". Population is not mentioned. These representatives were to meet and from their number select two from each county to constitute a Council, and to elect a Governor. The remaining representatives constituted the Legislative Assembly. The Council was to vote by counties, and not personally. The counties were thus the units of government. It was under this Constitution that Georgia ratified the federal Constitution and entered the Union. The State Constitution of May, 1789, adopted just after ratification of the federal Constitution, created a Senate composed of eleven members, one from each county elected therein for three years. The Representatives in the lower House were elected annually from each of the eleven named counties, Camden having two, Glynn two, Liberty four, Chatham five, Effingham two, Burke four, Wilkes five, Washington two, Greene two, Franklin two, Richmond four, a total of thirty four. The Governor was elected by the Senate every three years, out of three persons nominated by the Representatives. Population was not mentioned. Watkins Digest, Page 25. In May, 1795, under a new set up there were twenty counties and the representation was reapportioned. The elections by the General Assembly were by joint ballot of both Houses. Watkins Digest, Page 30. In May, 1798, Watkins Digest, Page 31, the representation for the then twenty-four counties was temporarily

fixed, each having two representatives except that Chatham, Wilkes and Hancock had each four. The principle was declared that representation should thereafter be "according to their respective numbers of free white persons, and including three-fifths of all the people of color", on an enumeration made each seven years, 3,000 persons thus enumerated to be entitled to two members, 7,000 to three members, and over 12,000 to four members; but each county to have at least one. This plan of enumeration is an evident reflection of Art. I, Sect. 3 of the federal Constitution fixing the apportionment of Representatives in Congress among the States. This Georgia Constitution thus recognized four classes of counties based roughly on population. The Governor was still elected by the General Assembly on joint ballot. There were still popular elections only by counties. In 1823 there was a change so that the Governor, beginning in 1825, should be elected each two years by persons qualified to vote for members of the General Assembly, and the Assembly was to canvass the returns and if no candidate had a majority of the votes the Assembly was to elect by joint ballot. Cobb's Digest, Page 1118. In 1842 the number of Representatives was fixed at 130, each county to have one, and the thirty-seven counties having the greatest population, enumerated as before, to have two; and a new apportionment was to be made "after each future enumeration of the inhabitants of this State". We suppose the federal decennial census is referred to, as we know of no other. Cobb's Digest, Page 1112. The Constitution of 1868, Art. III, Sect. 3, adopted during Reconstruction, and under which Georgia was readmitted to the Union, retained Senatorial districts, and made the House of Representatives to consist of 175 members, and apportioned them three to each of "the six largest counties", naming them; two to each of the "thirty-one next largest" counties, naming them; and to the remaining counties one representative each; with provision that the apportionment "may be changed by the general assembly" after each census by the United States Government. The cor-

responding section of the Constitution of 1877 limited the lower House to 175 Representatives, the six largest counties to have three each; the twenty-six next largest to have two each, and others one each; with permission to the General Assembly to change the apportionment after each United States Census. It was under this Constitution that the Neill Act was passed in 1917. The present Constitution of 1945, Art III, Sect. 111, Par. 1, does not limit the total number of Representatives and provides as above stated, that "the eight counties having the largest population three * * * each, to the thirty * * * next largest population two * * * each; and to the remaining counties one representative each". By Paragraph 2 reapportionment is required to be made by the General Assembly at its first session after each United States Census, so that a new apportionment will be made in 1951.

In Georgia, party nominations for officers to be elected in State-wide elections have been traditionally made in State Conventions of the party, the delegates to which are chosen in the several counties by mass meetings, or since 1872 by county primaries, each county having in the convention twice as many votes as it had representatives in the State House of Representatives. State-wide primaries began to be held in 1898, when the Democrats and Populists were in a doubtful struggle for power. The Populists did not succeed in the State-wide elections, though they did in many counties. The Republicans also frequently succeed now as to county offices, but have not carried a State-wide election since Reconstruction days, so that the Democratic nominees have uniformly won in them since 1872. Democratic nomination is not however the equivalent of election nor does it insure it, for much may happen before or in the final election; but the nomination is practically potent, and important to voters and candidates.

As to the operation of the Neill Act, it has had little effect. The holding of a primary is at the option of any political party, and is not requisite to nomination or to a place on the official ballot. When

a primary is held the law requires of the party that its result be ascertained on the county unit basis, as it had always been, in conventions and that it be so declared by the convention if held, and without a formal convention vote, and that the ascertained winners be certified for the official ballot. Provision is also made for a second primary instead of a convention vote if there is no majority. No departure from old party practice detrimental to the party voters in Fulton County appears.

The evidence does not disclose any legislative purpose to array county against city or to intentionally disfranchise urban voters. The history of the State, and of the political parties within it, shows that political power has from the beginning been exerted to a large extent through counties as voting units, along similar unit lines. We find as a fact that there was no bad or discriminatory intent in the Neill Act, beyond what necessarily follows from its provisions.

In practice in primary elections for Governor under the Neill Act the successful candidate according to county unit votes has also obtained the majority of the individual votes, save once in 1946. So as to United States Senator the same is true except once, and the successful candidate there had a plurality of individual votes. The candidate who carried Fulton County itself has more often than not won the primary under the Neill Act count.

Since this case was submitted party officials have informed the court that the Democratic Executive Committee at a meeting held on March 14, 1950 has called a primary to be held on June, 28, 1950. At the last session of the Georgia Legislature a resolution was adopted by the requisite two-thirds votes of each House to submit to the voters of the State at the general election in November, 1950, an amendment of the Constitution which, if adopted would write into the Constitution the provisions of the Neill Primary Act touching party nominations and also would make the election of United States Senator, Governor, and other State-wide officers to depend similarly on county units.

## Conclusions of Law.

The special defenses of the answers, summarized above, are each overruled and denied as being without merit or unnecessary to be decided except those involved in what we consider to be the crucial questions for our decision. They are: Does the federal Constitution forbid that a State may, in an election affecting the whole State, or a portion thereof, subdivide the territory affected into smaller units, to wit, counties, for the purposes of taking the vote and ascertaining the result, the subdivisions having materially different populations? Is the question of the propriety of such subdivisions a political question of which a court of equity may not take cognizance?

We put aside cases at law, whether for damages under a statute, or criminal prosecutions under a statute, involving the unlawful refusal to accept a voter's ballot, or to register him for voting, or properly to count his vote; in which the duty of a court to act is clear. Here each qualified person is to be permitted to vote and his vote is to be truly counted; and the whole trouble is that by subdividing the territory into voting units of unequal population, and presumably of unequal voting strength, one unit has an advantage over another unit in political effect. The petitioners complain of no wrong personal to themselves and not common to all voters in their unit. The wrong, if any, is to their unit. We of course accept the ruling of the Court of Appeals of this Circuit in Chapman v. King, 154 F.2d 460, that the attacked Statute is part of the election machinery of the State, and we shall discuss the questions as though the primary was a true election, but also noting the difference between the two. The cases on the question of the subdivision of the election territory, or nominating territory, are Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131; Colegrove v. Green, 328 U.S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432; Turman v. Duckworth, D. C., 68 F.Supp. 744, from this court, disposed of in the Supreme Court 329 U.S. 675, 67 S.Ct. 21, 91 L.Ed. 596, and referred to in a per curiam in Colegrove v.

Barrett, 330 U.S. 804, 67 S.Ct. 973, 91 L.Ed. 1262; and Mac Dougall v. Green, 335 U.S. 281, 69 S.Ct. 1.

Plaintiff's proposition that a vote in Fulton County has only one tenth the force that it would have but for the county unit rule of the Neill Primary Act, which is unjust and undemocratic, has strong appeal, but it is not a matter for this court to decide. Our question is primarily whether the federal Constitution is violated thereby. In general, that Constitution is not committed to elections by the people over the whole affected territory in which every vote will have equal weight, but rather the voting is by smaller units of unequal population and unequal voting power for each vote. The voting unit is never the whole United States but always the vote is by States, or smaller subdivisions as Congressional Districts under Congressional and State Statutes. The Constitution begins, "We, The People of the United States * * * do ordain and establish this Constitution for the United States of America"; but the people thereof never voted on it. Amendments thereto, under Article V affect the whole country, but are not voted on by the country, but by State units. The President is the President of the whole country, but is not elected by the equal votes of the people but by electors in each State appointed "in such Manner as the Legislature thereof may direct"; some of the electors are in proportion to population roughly, but two are from each State regardless of population. The only federal elections by the people were originally for the Representatives, apportioned to each State with regard to its population; and now by the Seventeenth Amendment Senators in identical words are to be elected by the people of each State; two senators from each State though in population Rhode Island and Nevada differ in population from New York, Pennsylvania and California as much as Fulton County does from Georgia's smaller counties. The voters for Senators and Representatives are those in each State qualified to vote for the members of the most numerous branch of the State Legislature, and Congress cannot change that. But by Article I, Sect. 4, Cl. 1, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such regulations * * *". The Congress under this power has fixed the manner of holding elections for Representatives, and ordained that they shall not be State-wide, but by Congressional Districts. See Wood v. Broom, 287 U.S. 1, 53 S.Ct. 1, 77 L.Ed. 131; and Colegrove v. Green, 328 U.S. at page 555, 66 S. Ct. 1198, 90 L.Ed. 1432. Congress has not fixed the manner of holding elections for Senators, so they remain under the power of the State Legislatures unless and until Congress sees fit to regulate.

True it is that Article IV, Sect. 4, provides, "The United States shall guarantee to every State in this Union a Republican Form of government", but this does not mean pure democracy. The Supreme Court has consistently held from Luther v. Borden, 7 How. 1, 12 L.Ed. 581, to Pacific States Tel. Co. v. Oregon, 223 U.S. 118, 32 S.Ct. 224, 56 L.Ed. 377, that it is for the Congress, the political department of the government, to define a republican form of government and to effectuate the guaranty, and not for the courts. But we may fairly assume that the Constitution itself is a satisfactory form and that the Constitutions of the ratifying States were esteemed such, as well as those of States since admitted to the Union. We have just seen that the federal Constitution does not employ elections by the people over the entire affected territory at all. The Constitution of Georgia of 1777, in effect when Georgia ratified the Union, and that adopted immediately afterwards, had no State-wide elections with votes of equal weight, but organized the State and operated it wholly on the county unit basis, using two port towns as units also under that of 1777. The Constitution of 1868, approved by Congress in readmitting Georgia to the Union, organized the State by county units substantially as at present, though there were some State-wide elections.

■ We therefore cannot say there is any general constitutional principle forbid-

ding or discouraging the use of territorial subdivisions in fixing the manner of conducting an election by the people. Whether subdivisions shall be made and how closely they shall be equalized is a matter of policy, that is to say, is a political question in which courts of equity may not meddle to set up their own ideas. That the subdivision need not be equal in population or even approximately so, was ruled in Wood v. Broom, supra, where a Mississippi Statute had created some Congressional Districts three times as populous as others, one of the contentions being that the equal protection clause of the Fourteenth Amendment was violated. The majority of the Justices, not particularly discussing this contention, but only the question of whether Congress had required districts of approximately equal population, ordered the bill dismissed, which had the effect of denying relief under the Fourteenth Amendment. The four other Justices concurred in the dismissal, but put it on the ground that the matter was political and not of equitable cognizance, injunction being the relief sought. The later cases above cited we understand to follow and not overrule Wood v. Broom, and to control our decision here.

As to equal protection of the law, shortly after the ratification of the Fourteenth Amendment in the elections of 1872, the idea was conceived by the women that they were denied equal protection under the Amendment by the State laws denying them the right to vote. Susan B. Anthony voted in New York and was prosecuted. Justice Hunt tried her on circuit and held that the Amendment had not altered voting qualifications. United States v. Anthony, 24 Fed.Cas. page 829, No. 14,459. Mrs. Minor, in Missouri, sought to register as a voter and was refused because she was a woman, and she sued for damages. In the Supreme Court it was unanimously held that the Fourteenth Amendment had not invested her with any right to vote. The equal protection clause was not even argued. The court said it took the Fifteenth Amendment to give colored people the vote, and there would have been no use to adopt

it if the Fourteenth had been intended to remove these discriminations. Minor v. Happersett, 21 Wall. 162, 22 L.Ed. 627. It took the Nineteenth Amendment to remove the discrimination against women. It is true that in Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759, a suit by a Negro for damages for refusing his vote in a Texas primary, the Fourteenth rather than the Fifteenth Amendment was relied on to sustain his right. Minor v. Happersett was not noticed, and has not been overruled. The Texas Statute declared, "In no event shall a negro be eligible to participate in a Democratic party primary election held in the State of Texas". Vernon's Ann.Civ. St. art. 3107 note. This was a glaring, purposeful discrimination in voting on the basis of color, which could not be a reasonable basis of classification under the Fourteenth Amendment, because the Fifteenth annulled it as a reasonable basis. The decision was well justified, though rather cryptically announced. In the present case there is no purposeful, malevolent discrimination against the plaintiffs, and no plain constitutional provision against subdivision of the election, but, the constitutional precedents, State and Federal, favor it.

■■■ The federal Constitution does not take from the States their right to set up their own internal organization and prescribe the manner of State elections. We do not think the Fourteenth Amendment condemns the Neill Primary Act as to them. If there is political wrong, the remedy is in the State Legislature which can so amend the Act as to deal with Fulton County specially. Certainly this court of equity should not adjudge the matter.

■■ As to the Senatorial election also, the remedy is political and can be sought either in the State Legislature or the Congress, for Congress may at any time regulate the manner of holding Senatorial elections. That primary elections only are involved makes no difference, because the Houses of Congress have several times investigated primaries in judging of the election of their members, and we think could even abolish primaries under the power

to regulate the manner of holding the elections. Again the courts of equity, under the cases first above cited, have no function.

But after all this is a State regulation of primaries, not final elections. It relates, not to the Democratic Party alone, but all parties, strong or weak, usually victorious or otherwise. A primary never elects, but only nominates. The voters who turn out and vote for the nominee, determine his election. These nominees have traditionally been chosen by all parties in State Conventions organized and voting in county units. The Neill Act does not command primaries nor abolish conventions, but tells a party that if it chooses to have a primary it must ascertain its result by the old convention standard, and abide by it, the convention no longer having the final choice of nominees. This has been accepted as reasonable until Fulton County by its own growth and absorption of other counties has become unique and wishes unique treatment. We are of the opinion as already stated that the judgment and conscience of the Legislature must afford it.

Wherefore it is now considered and adjudged that the relief prayed for be denied and that the petition be dismissed, at cost of plaintiffs.

ANDREWS, District Judge (dissenting).

I approach the matter of dissenting from my learned colleagues with great deference and do so only after a lengthy effort to reconcile my views with theirs. But I am unable to agree with the conclusions of law reached by the majority.

The Equal Protection Clause of the Fourteenth Amendment provides: "Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

I think the State Statute under attack, as applied to the statewide primary for any office, is repugnant thereto and should be so declared, and that injunction should be granted as sought.

Equity jurisdiction of the federal courts is discretionary, American Federation of Labor v. Watson, 327 U.S. 582, 593, 66 S. Ct. 761, 90 L.Ed. 873. Conceding that it should be sparingly exercised in state elections, Wilson v. North Carolina, 169 U.S. 586, 596, 18 S.Ct. 435, 42 L.Ed. 865, it is yet proper to employ it in clear cases.

Laying aside for the moment the critical questions of judicial power to afford injunctive relief in this case and the propriety of a decree it is difficult to imagine a more obvious denial of the equal protection of the laws than that imposed on plaintiffs by the county unit system or one with less foundation in experience, practicality or necessity. As qualified voters they are allowed to vote and their votes are counted. Then, by force of the statute, the votes are so consolidated that plaintiffs' votes are evaluated at one-eleventh the weight given to ballots cast in other parts of the State. Thus the basis of the discrimination is *place of residence,* a discrimination not justified on any reasonable basis of classification, nor can it be said to furnish plaintiffs the equal protection of the laws.

It is noted that the rural population outnumbers the urban and that throughout the state the percentage to total population of votes cast is fairly constant, i. e., proportionately no more city folks vote than do country people. This disposes of the notion, tacitly approved in MacDougall v. Green, 335 U.S. 281, 69 S.Ct. 1, that difficulty in getting to the polls should be recognized here as a makeweight in justifying a rank discrimination based on place of residence.

It is settled law that the constitutional protection of the voting right extends to a primary where such primary is an integral part of the state election machinery. United States v. Classic, 313 U.S. 299, 61 S.Ct.

1031, 85 L.Ed. 1368; Smith v. Allright, 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987, 151 A.L.R. 1110. The Georgia Democratic Primary has been adopted by the State of Georgia as an integral part of the state election process and party action in such a primary is state action. Denial of the right to vote in a Georgia Democratic Primary is a violation of a federally-protected right. Chapman v. King, 5 Cir., 154 F.2d 460. Denial of the right to vote is a violation of the Equal Protection Clause. Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, 88 A. L.R. 458; Smith v. Allwright, supra. The right to vote includes the right to have the ballot counted. United States v. Classic, supra; Ex parte Yarbrough, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274. The right to have the vote counted includes the right to have it counted without dilution and at full value. United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341. See dissent in Colegrove v. Green, 328 U. S. 549, 66 S.Ct. 1198, 90 L.Ed. 1432, where the majority disposed of the case on jurisdictional grounds without consideration of the Equal Protection Clause.

Moreover the county unit system as applied in the election of United States Senators may be a direct violation of the Seventeenth Amendment which guarantees election of Senators by the people.

The constitutional power of the Senate to exclude the chosen one has no bearing on the individual's right to have his vote counted properly. The record shows that since 1872 no candidate for United States Senator other than a nominee of the Democratic Party has been elected to that office from this State. In logic and in fact the Democratic primary election for United States Senators is the only election of any significance and voting in that election is the only effective stage of a voter's choice. See United States v. Classic, supra, and Smith v. Allwright, supra. Furthermore, the right to vote for a member of the Congress of the United States, including Senators, is a right secured by the Constitution. Ex parte Yarbrough, supra; Unit-

ed States v. Aczel, D.C., 219 F. 917. Abridgment of the right by the state is a violation of the Privileges and Immunities Clause of the Fourteenth Amendment. This right may not be abridged in a primary election, United States v. Classic, supra.

This case does not present a political question in the sense that the subject matter is nonjusticiable, Smiley v. Holm, 285 U.S. 355, 52 S.Ct. 397, 76 L.Ed. 795; Colgrove v. Green, supra; MacDougall v. Green, supra. The plaintiffs are not political entities seeking solution of abstract questions of political power, as in State of Georgia v. Stanton, 6 Wall. 50, 18 L.Ed. 721; Cherokee Nation v. Georgia, 5 Pet. 1, 8 L.Ed. 25; Commonwealth of Massachusetts v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078. They are not contesting a political office nor do they represent political entities seeking to enforce a right to good government common to all, as in Fairchild v. Hughes, 258 U.S. 126, 42 S.Ct. 274, 66 L.Ed. 499; Commonwealth of Massachusetts v. Mellon, supra. Plaintiffs sue as individuals to enforce rights political in origin but nonetheless personal and individual. Nixon v. Herndon, supra.

Colegrove v. Green, in which four of seven justices held a justiciable issue was presented, stands for the proposition that equity must withhold injunctive relief where the consequences of a decree might be worse than the evil to be remedied. Where the evil complained of can be remedied without disruption of a pending election and without denial of rights to other citizens, as in the instant case, the rule of Colegrove v. Green does not apply. Colegrove v. Barrett, 330 U.S. 804, 67 S.Ct. 973, 91 L.Ed. 1262, has the same authority on the issue of justiciability as Colegrove v. Green, upon which it is based.

Moreover, the opinion of the three justices who found the issue in Colegrove v. Green to be nonjusticiable is distinguishable from this case. There is no question here of interference with Congress in its power to control the manner of holding elections. There is no necessity for this Court to remap the State politically, nor for the Georgia General Assembly to take

any action. There is no problem here of individuals seeking to right a wrong to the State as a polity. Plaintiffs do not complain of any wrong done their county, nor do they seek remedy for the unequal representation accorded their county in the General Assembly. They ask only that their votes be valued equally with other votes cast for the same offices.

MacDougall v. Green, supra, involved issues of justiciability substantially similar to Colegrove v. Green. A majority of the Court decided the case on its merits, holding that the discrimination complained of was not of sufficient degree to warrant judicial correction. The Court took jurisdiction of the case in order to decide the substantive issues involved. Furthermore, MacDougall v. Green related only to the direction from which political initiative may be permitted to come; it is not authority for permitting gross dilution of a ballot cast.

The cases cited above sustaining the justiciability of the instant case are also authority for the fundamental jurisdiction of this Court to grant equitable relief. In Colegrove v. Green, supra, a majority of the Court found no want of equity, though a majority, differently composed, concluded that the relief sought should be denied. In MacDougall v. Green, supra, a majority of the Court refused relief on substantive grounds, but interposed no bar to the exercise of equitable jurisdiction. See also Rice v. Elmore, 4 Cir., 165 F.2d 387, certiorari denied 333 U.S. 875, 68 S.Ct. 905, 92 L.Ed. 1151.

From these cases there can be no longer any doubt that the protection of individual political rights is within the legitimate exercise of equitable power where the consequences of a decree do not present practical difficulties to its enforcement. Giles v. Harris, 189 U.S. 475, 23 S.Ct. 639, 47 L.Ed. 909, has been so interpreted by the Supreme Court. Lane v. Wilson, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281; Colegrove v. Green, supra, dissent.

Keeping in mind the nature of federal equity jurisdiction, and that it should be most sparingly exercised in State elec-

tions, the controlling question in this case is one of equitable discretion: Are the probable consequences of a decree such that equity should withhold its hand? The vote of a citizen living on one side of Moreland Avenue in Atlanta, DeKalb County, equals five of his neighbor directly across the street in Atlanta, Fulton County. This discrimination imposed by the Statute in the most flagrant instance in the ratio of 122 to 1 and on an average ratio of approximately 11 to 1 is so apparent and so unjustifiable on any reasonable basis of classification that only the most compelling reasons should influence this Court to refuse relief.

I am unable to find any unpalatable practical consequences to the granting of an injunction in this case. There will be no necessity for this Court to supervise any election, an eventuality upon which Giles v. Harris, turned. The gross discrimination wrought by the offending statute occurs after the votes have been cast and counted by a method employed by the State Democratic Executive Committee and its chairman and secretary. The effective application of the discrimination to the plaintiffs occurs when the nominees are placed on the general election ballot by the Secretary of State. All of these instruments of discrimination are defendants here and an injunction forbidding their actions under the offending statute will effectively end the discrimination. The relief granted in Rice v. Elmore, supra, required of the Court vastly greater supervision of the electoral process than is asked or required in this case.

Granting of injunctive relief will not bring about any of the practical consequences feared by the Court in Colegrove v. Green, supra. No disruption of a pending election will ensue. The only change which will be effected is the method of consolidating the vote at the top level of the Georgia Democratic Party. The votes will be cast and counted in precinct, ward and county without change or interruption. The Georgia General Assembly need take no action to provide an alternative method of determining nominees, for under Georg-

ia law the responsibility will revert to the party. Defendants in argument and brief have relied heavily upon two other suits which involved attacks upon the Georgia County Unit System, Turman v. Duckworth, D.C., 68 F.Supp. 744, and Cook v. Fortson, D.C., 68 F.Supp. 624 both decided in 1946 by this Court. The Supreme Court of the United States dismissed appeals on the grounds of mootness, citing United States v. Anchor Coal Company, 279 U.S. 812, 49 S.Ct. 262, 73 L.Ed. 971; Turman v. Duckworth, 329 U.S. 675, 67 S.Ct. 21, 91 L.Ed. 596.

These cases have no application to the case at bar. The District Court in each case based its decision on Colegrove v. Green, supra. As discussed above, that case is authority only for the discretionary power of equity to deny relief under the circumstances of that case. In the earlier county unit cases, the plaintiffs sought to overturn a completed primary election after they had participated in the primary without objection, on the grounds that candidates for whom they had voted received a plurality of votes cast in their respective contests but were not declared nominees of the party. The candidates themselves did not complain and one of them even went so far as to intervene to ask that the suit be dismissed.

The consequences of injunctive relief in those two cases presented practical problems in the exercise of the Court's discretionary powers not perceivable in the instant case, and viewed in this light the District Court decisions in them are not precedent for denial of relief here. Furthermore, since rendition of the District Court opinions in these cases, the Supreme Court of the United States took jurisdiction to decide the substantive issues in MacDougall v. Green, supra.

I am of the opinion that plaintiffs are entitled to a declaration that the Statute attacked is invalid and that an injunction should issue to restrain the application of the county unit system to future statewide Democratic Party elections in Georgia.